Connie T. DUNN, Plaintiff
and Appellant,

v.

Harold K. DUNN, an individual, and Harold K. Dunn, M.D., P.C., a Utah professional corporation, Defendants and Appellees.

No. 880611–CA.

Court of Appeals of Utah.

Nov. 20, 1990.

Patricia A. O'Rorke (argued), Berman & O'Rorke, Salt Lake City, for plaintiff and appellant.

Clark W. Sessions (argued), Dean C. Andreasen, Sessions & Moore, Salt Lake City, for defendants and appellees.

Before BILLINGS, GARFF and ORME, JJ.

## OPINION

GARFF, Judge:

Appellant Connie T. Dunn appeals the trial court's distribution of the marital estate in this divorce action. We affirm in part, reverse in part, and remand in part.

The parties were married on December 17, 1977 and divorced on September 20, 1988. At the time of the marriage, Mrs. Dunn was twenty-six years old, and had previously been married but had no children. She held an associate degree from Stevens Henager Business School and worked full time as a medical secretary, earning about $14,000 per year. Dr. Dunn, at the time of marriage, was thirty-nine years old, had previously been married for seventeen years, and had two children. He was an associate professor at the University of Utah School of Medicine, and practiced orthopedic surgery at the University's Division of Orthopedic Services and at Shriners Hospital.

During the marriage, Dr. Dunn worked sixty to seventy hours per week to advance his extremely successful medical career. He was promoted to full professor in 1980 and became chair of the University's Department of Orthopedics in 1981. He continued to practice orthopedic surgery, incorporating his practice in 1981. He served as a visiting professor at numerous institutions and published many articles on orthopedic surgical techniques and devices. He served in committee and officer positions in the American Academy of Orthopedic Surgeons, and was invited to join the prestigious twelve-member American Board of Orthopedic Surgery. He spent approximately two weekends per month traveling in connection with his professional activities. Dr. Dunn's income increased during the marriage from $71,381 in 1977 to $357,889 in 1987. His current financial statement indicated that he made $403,345.82 per year in gross income and $280,661.99 in net income.

During the marriage, Mrs. Dunn devoted herself to supporting her husband's career. Eighteen months into the marriage, she resigned from her secretarial position so she would have time to travel with Dr. Dunn, perform secretarial and bookkeeping duties for him, entertain his professional and business associates, run errands for him, manage the household accounts and run the house. She also coordinated the construction of a large house the couple built in 1984.

Dr. Dunn brought $423,000 worth of property into the marriage, some of which remained identifiable throughout the marriage, some was augmented, some was traded, some was sold, and some was commingled. The property included a condominium worth $22,493; a 278–acre ranch in Idaho worth $230,340; a 1974 Porsche worth $8,700; an airplane worth $26,000; an established medical practice; and benefits from three retirement plans, along with accrued interest on the premarital portion of each plan. In contrast, in material terms, Mrs. Dunn brought an automobile worth $2,100 into the marriage.

During the marriage, Dr. Dunn, together with an associate, designed surgical instruments for the implantation of artificial knees, marketed by Zimmer, Inc. On December 1, 1985, Dr. Dunn executed a license agreement with Zimmer which provided fixed royalty payments in exchange for a license to use and sell those surgical instruments. These royalty payments totaled $375,000 between 1986 and 1990, $243,750 of which remained to be paid at the time of trial. No provision in this royalty agreement required Dr. Dunn to perform any personal services. Dr. Dunn also had a contract with Zimmer involving a hip device, and he consulted with Zimmer from time to time involving spinal devices. Unlike the knee royalty agreement, the hip royalty agreement required Dr. Dunn to consult, to present workshops, and to perform other similar personal services for Zimmer. In 1987, he traveled twenty-eight days in connection with both the knee and hip contracts.

No children were born of the marriage. Mrs. Dunn wanted to adopt, but Dr. Dunn, who already had children from a previous marriage, did not want to adopt, and he vetoed the idea. The marriage ended when Dr. Dunn initiated a relationship with another woman, told his wife he no longer loved her and moved out of the home.

After the separation, the then thirty-seven year old Mrs. Dunn enrolled at the University of Utah. By the time of trial, she had attended the university full time for eighteen months, was working toward a bachelor's degree in commercial recreation and tourism, and hoped to earn an M.B.A.

The first issue on appeal is whether the trial court abused its discretion in excluding from the marital estate the professional corporation, the royalties from the artificial knee contract, and the premarital portion of the retirement contract, in addition to all interest accrued on that portion. The second issue on appeal is whether the trial court abused its discretion in approving a two-to-one division in favor of Dr. Dunn on the remainder of the marital estate based on the court's finding that Mrs. Dunn made no significant contributions to her husband's career and prodigious earnings.

## STANDARD OF REVIEW

"In a divorce proceeding, 'determining and assigning values to marital property is a matter for the trial court and this court will not disturb those determinations absent a showing of clear abuse of discretion.'" *Sorensen v. Sorensen,* 769 P.2d 820, 823 (Utah Ct.App.1989), *cert. granted,* 779 P.2d 688 (Utah 1989), (quoting *Talley v. Talley,* 739 P.2d 83, 84 (Utah Ct.App.1987)). To permit appellate review of the property distribution, the distribution must be based upon adequate factual findings and must be in accordance with the standards set by this state's appellate courts. *Haumont v. Haumont,* 793 P.2d 421, 424 (Utah Ct.App.1990); *Munns v. Munns,* 790 P.2d 116, 118 (Utah Ct.App. 1990). We will not disturb a trial court's findings unless they are clearly erroneous, that is, against the clear weight of evidence, or unless we reach a definite and firm conviction that a mistake has been made. *Weston v. Weston,* 773 P.2d 408, 410 (Utah Ct.App.1989); *Rothe v. Rothe,* 787 P.2d 534, 535–36 (Utah Ct.App.1990); Utah R.Civ.P. 52(a).

### A. The Professional Corporation

Marital property is ordinarily all property acquired during marriage and it

"encompasses all of the assets of every nature possessed by the parties, whenever obtained and from whatever source derived." *Gardner v. Gardner,* 748 P.2d 1076, 1079 (Utah 1988) (quoting *Englert v. Englert,* 576 P.2d 1274, 1276 (Utah 1978)). In *Sorensen v. Sorensen,* 769 P.2d 820 (Utah Ct.App.1989), we affirmed the trial court's conclusion that the accounts receivable, tangible assets, and goodwill of a professional practice were includable in the marital estate, to the extent they were accumulated during the marriage, in a situation where the husband began his dental practice six years before the marriage began. *Id.* at 832.

Mrs. Dunn's position is more conservative than the prevailing view in *Sorensen* in that she does not assert an interest in her husband's ongoing practice. Rather, Mrs. Dunn asserts an interest in the tangible assets of a corporation that was established during the marriage.[1]

In *Lee v. Lee,* 744 P.2d 1378 (Utah Ct. App.1987), we considered a nine year marriage during which the husband established a corporation. The wife contributed some bookkeeping. More significant were her domestic contributions which freed her husband to participate full time in running the business. We held in *Lee* that the wife was entitled to her full equitable share of the corporation because of the parties' joint efforts in establishing and maintaining the corporation. *Id.* at 1380–81.

■ Here, Mrs. Dunn argues, and we agree, that the trial court abused its discretion by characterizing Dr. Dunn's professional corporation as a nonmarital asset. The corporation was founded and its assets accrued during the marriage and she performed bookkeeping and secretarial services without pay for the corporation. Thus,

the corporation was founded and operated through the joint efforts and joint sacrifices of the parties. In addition, because Dr. Dunn chose to work sixty to seventy hours per week, he left Mrs. Dunn with the sole responsibility of running the household and managing the household accounts. Further, she was left without his companionship and domestic contributions during those hours. While she was not his partner in the business of orthopedic surgery, she was his partner in the "business" of marriage and her efforts were necessary contributions to the growth of his practice and the business. As such, she is entitled to her fair share in any marital assets derived from their joint efforts in that endeavor. *Lee,* 744 P.2d at 1380–81.

The lower court found that the "net tangible assets are not marital assets and are not subject to division in this action." Other than this assertion, the court gave no reason for this finding and we can find no support for it in the record. We therefore reverse and remand for an equitable, which in this case means equal, distribution of the net tangible assets of the professional corporation.

## B. Royalty Rights

This court recently affirmed that the right to future income is a marital asset where that right is derived from efforts or products produced during the marriage, even in cases where that right cannot be easily valued. *Moon v. Moon,* 790 P.2d 52, 56–57 (Utah Ct.App.1990) (right to use sculpture molds is a marital asset); *see also Sorensen,* 769 P.2d at 827; *Woodward v. Woodward,* 656 P.2d 431, 432–33 (Utah 1982).

■ Dr. Dunn argues that the development of the surgical instruments for im-

---

1. Dr. Dunn's accountant valued the hard assets of the corporation at $115,845 as of March 31, 1988, six months before the divorce. This valuation included $79,000 in cash, an advance receivable of $53,224 from Dr. Dunn, fixed assets valued at $11,435 and furniture valued at $2,500. Liabilities totaled only $30,314. Mrs.

Dunn's expert witness placed a higher value on the professional corporation, including a value for goodwill. However, Mrs. Dunn does not challenge the fact that the trial court found that no value should be attributed to goodwill. *See Sorensen,* 769 P.2d 820 for valuation and distribution of goodwill.

planting artificial knees came as a result of twenty-six years of education and training, most of which predated this marriage. He implies that since *all* of the necessary knowledge, skill and expertise was not acquired during the marriage, Mrs. Dunn should not share in the resulting profits. We find this argument without basis in law or in equity.

Mrs. Dunn asserts, and we agree, that the lower court abused its discretion in finding she had no marital interest in Dr. Dunn's royalty rights for his invention of surgical instruments used for implanting artificial knees. She argues that the instruments were invented during the marriage, that nothing in the royalty contract conditions the payment of royalties upon Dr. Dunn's personal services, and that Dr. Dunn himself characterized the income as "installment payments from the sale of property" on the parties' joint 1987 income tax return. This contract, executed December 1, 1985, entitles Dr. Dunn to fixed quarterly payments totaling $375,000 between 1986 and 1990; $243,750 of the royalties earned during the marriage remained to be paid at the time of trial.

The lower court found that the contract would be "worthless" without his future personal services. However, although Dr. Dunn did spend time demonstrating the instruments, it was not specifically required by the contract. This contract, unlike the one pertaining to the artificial hip devices, is a royalty agreement and not a personal services agreement.[2]

The record indicates that the knee contract is not conditioned upon Dr. Dunn's personal services and that the primary benefit to Zimmer for the contract is the right to distribute the artificial knee instruments. Because the lower court found that Dr. Dunn traveled twenty-eight days per year doing business that related "equally to the hip agreement and the knee agreement," and because Dr. Dunn is entitled to

be recompensed for his time, we remand this issue to the lower court to deduct an amount equal to fourteen days of personal service from the value of the knee contract and to treat the remainder as a marital asset and to value it as of the date of the divorce and distribute to Mrs. Dunn her equitable share, which, in this case, would be one half.

### C. Retirement Benefits

■ It is well settled that the present value, as well as any deferred earnings of retirement accounts accrued during the marriage, are marital assets and, whenever possible, should be valued as of the time of the divorce and should be equitably divided. *Morgan v. Morgan*, 795 P.2d 684, 687 (Utah Ct.App.1990); *Berger v. Berger*, 713 P.2d 695, 697 (Utah 1985); *Woodward*, 656 P.2d at 432–33. The timing of distribution of these benefits depends on the particular circumstances, including whether there is particular animosity between the parties favoring an immediate disbursal or whether an immediate distribution would create a hardship or penalty. *Gardner*, 748 P.2d at 1079; *Motes v. Motes*, 786 P.2d 232 (Utah Ct.App.1989) *cert. denied*, 795 P.2d 1138 (Utah 1990); *Bailey v. Bailey*, 745 P.2d 830, 832 (Utah Ct.App.1987).

Mrs. Dunn argues that she should be awarded an equitable share of all the retirement benefits accrued during the marriage and that the lower court should have provided a means for distribution of those funds. She further asserts that the trial court based its findings of value upon stale data because some of the accountings relied upon by Dr. Dunn's expert were dated as late as fifteen months prior to the trial. As a result, these accountings did not reflect contributions up to the date of trial.

Dr. Dunn argues that the valuation conducted by his accountant occurred sufficiently near the time of trial to be valid.

---

**2.** Dr. Dunn also had a contract with Zimmer regarding the distribution of a surgical instrument to implant artificial hips. This agreement explicitly requires Dr. Dunn to travel and give demonstrations. Mrs. Dunn is not asserting an interest in the hip agreement.

He further argues that the parties stipulated to the valuations of his expert.

 The marital estate, and this includes retirement accounts, should be valued as of the time of the divorce decree. *Morgan,* 795 P.2d at 687; *Berger,* 713 P.2d at 697. Because the data were collected and the valuations were performed well before the date of divorce, the findings are inadequate to support an equitable division of this sizable asset. *Haumont,* 793 P.2d at 425; *Munns,* 790 P.2d at 118. While the parties stipulated to the values of the retirement accounts as of the date of valuation, they also stipulated to the possibility that the values of the accounts may change between the date of the valuation and the date of the divorce. We are not persuaded that the stipulation purported to fix the value of the retirement account as of the date of the divorce decree. We therefore remand the issue to the lower court to value the retirement accounts as of the date of divorce.

Mrs. Dunn asserts that the lower court improperly credited Dr. Dunn with projected earnings of $90,908 on the $43,173 portion of the retirement benefit that he had accumulated prior to the marriage.

 The issue of accrued interest on the premarital portion of the retirement account should be analyzed pursuant to the general rules regarding premarital property and separate property. The general rule is that equity requires that each party retain the separate property he or she brought into the marriage, including any appreciation of the separate property. *Burt v. Burt,* 799 P.2d 1166, 1168 (Utah Ct.App.1990) (separate property, in this case inherited property, includes "its appreciated value" during the marriage). Exceptions to this general rule include whether the property has been commingled, whether the other spouse has by his or her efforts augmented, maintained, or protected the separate property, and whether the distribution achieves a fair, just, and equitable result. *Id.; Noble v. Noble,* 761 P.2d 1369, 1373 (Utah 1988).

 We agree with the lower court that Dr. Dunn is entitled to his premarital contributions to the retirement account. Because the record does not indicate that Mrs. Dunn, through her efforts, augmented, maintained, or protected the separate property, other than her maintenance of the household accounts, we agree with the lower court that Dr. Dunn is also entitled to all interest attributable to those contributions. The problem here is that both the record and the findings are inadequate to determine precisely which is which. While the lower court made a finding as to the interest on the premarital portion, that finding was based on the testimony of Dr. Dunn's accountant, who testified that he had no personal knowledge as to the amount of interest accrued. In fact, the accountant testified that, to arrive at a figure for interest on the premarital portion of the accounts, he examined none of the pertinent documents and obtained his figures by telephoning workers at the plan administrator's office.

 As to the issue of the equitable division of the retirement accounts, the only finding made by the trial court for its unequal distribution was that Mrs. Dunn enjoyed a standard of living "substantially greater than she ever could have achieved on her own" and that Dr. Dunn achieved his financial success "through really no contribution of [Mrs. Dunn] other than her being married to him." As we have noted, Mrs. Dunn was an equal partner in the marriage and the distribution of all marital assets should reflect that fact. *Maxwell v. Maxwell,* 754 P.2d 84, 86–87 (Utah Ct.App. 1988).

We therefore reverse and remand the division of the retirement accounts and direct the lower court to issue a qualified domestic relations order, directing the plan administrators to issue a proper valuation of the accounts as of the date of the divorce and to determine the amount of interest accrued from premarital contributions to the retirement accounts. Dr. Dunn should then be credited with all premarital

contributions, as well as the interest accrued thereon. We further direct that, once the accounts have been valuated, and the appropriate credits have been given, Mrs. Dunn's equal share of the remainder should be immediately disbursed or she should be awarded an offset equal to her half of the retirement accounts from other portions of the marital assets.

### D. Credits for Premarital Property

Generally, the rule for premarital property is that each party retain the separate property he or she brought into the marriage. *Haumont*, 793 P.2d at 424–25. Some exceptions include where the property has been commingled so that it has lost its separate character, *id.*, or where it is fair, just and equitable to do otherwise. *Noble*, 761 P.2d at 1373 (where wife had present and future support needs and husband had inability to provide sufficient alimony, it was equitable to award wife premarital property).

Mrs. Dunn argues that the lower court abused its discretion by allowing Dr. Dunn a $150,000 credit for his premarital property. Part of this amount reflects moneys in the retirement accounts, which issue we have already discussed. The remaining property includes two cars, an airplane and a promissory note. She argues that the property should have been characterized as marital property because its separate identity was lost through commingling, exchanges or by Dr. Dunn's conduct evidencing an intention to treat the property or its proceeds as marital property.

Dr. Dunn was credited with $26,000 for an airplane he owned prior to the marriage. That plane was sold for $10,000 and he used $6,500 from that amount as a down payment on another airplane. Significantly, the installment payments on the second plane, totalling $47,844, came from marital income.

Dr. Dunn owned a condominium prior to the marriage. The parties occupied it from the time of their marriage in 1977 to 1984, when they sold it and used part of the proceeds for a cash down payment on their new home and the rest for a promissory note payable to them jointly. The trial court granted Dr. Dunn a credit of $22,493 against the stipulated value of $33,785, leaving only $11,292 of the value of the note in the marital estate. Dr. Dunn's credit was intended to equal the premarital equity in the condominium, even though the proceeds from the sale of the condominium became commingled into the marital estate.

Finally, Dr. Dunn received an $8,700 credit against a Porsche purchased by the professional corporation in 1986 and a 1983 Blazer purchased with marital income. This credit was based upon a car Dr. Dunn owned at the time of marriage, although there was no competent evidence of its 1977 value. Further, the court found that the car was sold and the proceeds deposited in the parties' joint bank account. Mrs. Dunn was credited with $2,100, representing a car she owned prior to the marriage.

Premarital property was consumed and its identification lost through commingling and exchanges. The record shows that the sale of each credited piece of property resulted in a deposit into the parties' joint accounts or, in the case of the condominium, a promissory note in the joint names of the parties. Premarital property may lose its separate distinction where the parties have inextricably commingled it into the marital estate, or where one spouse has contributed all or part of the property to the marital estate. *Burt*, 799 P.2d at 1168 (citing *Mortensen v. Mortensen*, 760 P.2d 304, 308 (Utah 1988)). We therefore hold the trial court's treatment of this property as separate property was an abuse of discretion. We reverse the award of credits to Dr. Dunn for the airplane, condominium and the car, and we reverse the award of a credit to Mrs. Dunn for her car. Because our reversal of the award of credits changes the size of the marital estate, that issue is remanded for consideration consistent with this opinion.

## PROPERTY DIVISION

Finally, Mrs. Dunn argues that the lower court abused its discretion in awarding approximately twenty-four percent of the marital property to her and seventy-six percent to her husband based upon a finding that Dr. Dunn had contributed more to the marriage than she. The court found that

> during the course of the parties' marriage, the parties have acquired substantial assets and have lived on a relatively high scale. The Court further finds that the Plaintiff enjoyed the fruits of the defendant's earning ability during the course of the marriage of the parties.

> . . . . .

> The Court finds that the standard of living which the Plaintiff enjoyed during the course of the marriage was substantially greater than she ever could have achieved on her own. The Court further finds that the period of the marriage covered probably the most productive period of the Defendant's life, when his abilities, personal to himself, increased the greatest through really no contribution of the Plaintiff other than her being married to him.[3]

The trial court is allowed considerable discretion in the division of marital property, so long as it exercises this discretion in accordance with the standards set by this state's appellate courts. *Munns,* 790 P.2d at 118. The Utah Supreme Court has defined the factors for the trial court to consider in fashioning an equitable property division:

> the amount and kind of property to be divided; whether the property was acquired before or during the marriage; the source of the property; the health of the parties; the parties' standard of living, respective financial conditions, needs, and earning capacity; the duration of the marriage; the children of the

marriage; the parties' ages at time of marriage and of divorce; what the parties gave up by the marriage; and the necessary relationship the property division has with the amount of alimony and child support to be awarded.

*Burke v. Burke,* 733 P.2d 133, 135 (Utah 1987) (footnote omitted). We note that these factors do not include a consideration of which partner was the more economically productive during the marriage. In *Lee,* 744 P.2d 1378, this court considered the case of a nine year marriage wherein the husband had established a corporation and the wife had performed domestic duties and some clerical duties to allow her husband to participate full time in the business. We held the wife was entitled to a fair and equitable share of the marital assets, either through a cash settlement or through an in-kind distribution. *Id.* at 1381.

While we agree that Dr. Dunn had remarkable skills and worked diligently to earn as much as $357,889 in a year and to acquire vast holdings, we do not agree with the trial court's conclusion that a spouse's property award at the time of divorce should be measured according to the amount he or she directly contributed to the financial success of the marriage. The lower court's approach to marital property distribution is troublesome as it suggests a weighing only of each partner's financial contribution to the marriage. Such an analysis ignores contributions of love, encouragement, and companionship, which elude monetary valuation. Such an analysis also gives short shrift to spouses who contribute homemaking skills and child care.

The overriding consideration in property division is "that the ultimate division be equitable—that property be fairly divided between the parties given their contributions during the marriage and their

---

**3.** We note that these years were also the most productive years of Mrs. Dunn's life during which time she gave up, or at least greatly postponed, having children and pursuing her own education and career.

circumstances at the time of the divorce." *Burt*, 799 P.2d at 1171 (quoting *Newmeyer v. Newmeyer*, 745 P.2d 1276, 1278 (Utah 1987)). On remand, the trial court should follow the systematic approach set forth in *Burt*. That is, the court should first properly categorize the parties' property as part of the marital estate or as the separate property of one or the other as set forth in this opinion. Each party is then presumed to be entitled to all of his or her separate property and fifty percent of the marital property. *Burt*, 799 P.2d at 1171; *Maxwell v. Maxwell*, 754 P.2d 84, 86–87 (Utah Ct.App.1990) (absent special circumstances, property accumulated by the parties during the marriage should be equally divided).[4]

We find that the trial court abused its discretion when it justified an unequal and inequitable distribution of marital property based solely on the parties' economic contributions to the marriage. We therefore reverse and remand this issue for the court to award Mrs. Dunn her full equal share of all marital property consistent with this opinion.

## CONCLUSION

We find the trial court abused its discretion when it concluded that the tangible assets of the professional corporation, the royalty rights, and the retirement benefits were not a part of the marital estate. We reverse the trial court's credit of premarital assets, with the exception of the premarital portion of the retirement accounts and its appreciation, and the inequitable property distribution in general. While we affirm the court's award of the premarital portion of the retirement accounts plus interest, we remand for the court to make adequate findings of the value of the separate and marital portions of these accounts in conformance with this opinion.

4. We note that our appellate courts have approved unequal distributions, but only in cases where a "significant compensating factor" could justify such a split. *Workman v. Workman*, 652 P.2d 931, 932 (Utah 1982) (where the wife received sixty percent of the marital property

Affirmed in part, reversed in part, and remanded in part.

BILLINGS and ORME, JJ., concur.

while the husband retained his entire pension and paid no alimony); *Savage v. Savage*, 658 P.2d 1201, 1203–05 (Utah 1983) (where the wife retained sixty percent of the assets after a twenty year marriage and after her full time assumption of the domestic burdens).