2017 UT App 146

## THE UTAH COURT OF APPEALS

CRISTY DEAVILA,
Appellant,
*v.*
PERICLES DEAVILA,
Appellee.

Opinion
No. 20160024-CA
Filed August 10, 2017

Second District Court, Farmington Department
The Honorable Michael G. Allphin
No. 144700136

Ben W. Lieberman, Attorney for Appellant

Stacy J. McNeill, Eric B. Vogeler, and Jenna Hatch,
Attorneys for Appellee

JUDGE JILL M. POHLMAN authored this Opinion, in which JUDGES
GREGORY K. ORME and J. FREDERIC VOROS JR. concurred.[1]

POHLMAN, Judge:

¶1     Cristy DeAvila, now known as Cristy Brown, appeals the
trial court's division of marital assets under a decree of divorce.
We affirm.

### BACKGROUND

¶2     Brown and Pericles DeAvila married in 2004, separated in
2013, and divorced in 2015. At a one-day bench trial, the parties

---

1. Judge J. Frederic Voros Jr. participated in this case as a
member of the Utah Court of Appeals. He retired from the court
before this decision issued.

disputed, among other things, the division of two assets relevant to this appeal, namely, the insurance proceeds stemming from the destruction of a vehicle (the Lexus) and the stock from DeAvila's company (the Sector 10 stock).

¶3 At trial, Brown took the position that the Lexus was her separate property and that she should retain all of the insurance proceeds. Brown had listed the Lexus in her name on her financial declaration, and she testified that DeAvila bought the Lexus and gave it to her as a gift for her birthday. According to Brown, DeAvila had a vehicle "through [his] business," and Brown had paid the insurance on that vehicle. When the business vehicle was totaled, DeAvila used proceeds from the insurance to buy the Lexus. Brown further testified that the Lexus was "destroyed" during the parties' separation and that she believed DeAvila was responsible for the damage because she "saw him driving by [her] house" within fifteen minutes of hearing "loud bashes" in her garage. After this incident, which totaled the Lexus, Brown received an insurance check for $17,371. Because, in her view, DeAvila "intentionally destroyed" the Lexus, Brown alternatively asserted that even if the Lexus was deemed to be marital property, DeAvila was "not entitled to the benefit of the insurance proceeds under the collateral source rule."

¶4 DeAvila asserted that the parties were "jointly listed as owners" of the Lexus. He testified that he purchased the Lexus, believed he was an owner, and titled it in his name. DeAvila provided supporting evidence, including the 2009 bill of sale and the sales contract for the Lexus, which named DeAvila as the buyer. He also provided an exhibit with the application for original title, identifying himself as the primary owner and Brown as the secondary owner, but the record does not contain a copy of the original certificate of title.

¶5 DeAvila further asserted that shortly after the Lexus was damaged, Brown re-titled the Lexus "exclusively in her name." In support, he provided a corrected certificate of title, dated after

the Lexus was damaged, which listed only Brown as an owner. In his trial brief, he stated that he was "being prosecuted for charges associated with damage done" to the Lexus, and at trial he invoked the Fifth Amendment to the United States Constitution, refusing to answer questions about whether he damaged the car. Nonetheless, DeAvila claimed that Brown should pay him one-half of the insurance proceeds as his marital share.

¶6      With regard to the Sector 10 stock, Brown asserted that Sector 10 was a publicly traded company whose stock was traded "'over the counter'" and testified that the stock's market price as of the day of trial was five cents per share.[2] She testified that she held Sector 10 stock in her name, amounting to at least 400,000 shares. Brown urged the trial court to award DeAvila "his separate assets, including all shares in the Sector 10 [entities]," stating that "[w]hatever shares . . . are out there . . . he should be awarded those shares." She further urged the court to value the Sector 10 stock at the market price of five cents per share.

¶7      DeAvila, for his part, alleged in his trial brief that he had transferred to Brown "at least 11 million shares of Sector 10 stock," which were worth ten cents per share in 2008, totaling $1.1 million. He further alleged that Brown had dissipated that asset, and he sought a judgment for his half of the value of that stock. At trial, he testified that the current Sector 10 stock price was "[f]ive to seven cents" per share. But DeAvila also testified that the company had no value and was "going to basically file [for] bankruptcy" due to the fact that attorneys who were handling litigation on its behalf on a contingency fee basis had

---

2. Over-the-counter trading is carried out directly between two parties and does not involve the supervision of an exchange. *Over-the-counter (finance)*, Wikipedia, https://en.wikipedia.org/wiki/Over-the-counter_(finance) [https://perma.cc/YS9Q-BET5].

recently "dropped" the case. In closing argument, he encouraged the court to value the shares at five cents per share.

¶8      During his testimony, DeAvila referred to the company's Form 10-K that Sector 10 had filed with the Securities and Exchange Commission approximately one month before trial. The 10-K stated that Sector 10's common stock had "an average market value of $.05 per share" and indicated that the stock traded on the Pink Sheets.[3] The 10-K also disclosed pending litigation matters and resulting uncertainties, and showed that for the prior year, the company was operating at a loss and had an overall lack of revenue, income, and assets.

¶9      The trial court entered a decree of divorce in December 2015. Among other things, the court found that the parties owned a boat and four vehicles at the time of separation. It further found that one of those vehicles, the Lexus, "was destroyed" and subsequently declared a total loss by the insurance company. The court found that Brown had received $17,371 in insurance proceeds for the Lexus and that those proceeds were a marital asset. The court then awarded three of the vehicles to Brown and a boat and one of the vehicles to DeAvila. Because the value of the property awarded to Brown was worth more than that awarded to DeAvila, the court determined that DeAvila was "entitled to a judgment of $8,325 for the difference in value."

---

3. The Pink Sheets, now known as the OTC Markets Group, was a financial market for over-the-counter securities. *OTC Markets Group*, Wikipedia, https://en.wikipedia.org/wiki/OTC_Markets_Group [https://perma.cc/MPT4-JFSQ]. The 10-K indicated that the Sector 10 stock closed at seven cents per share on March 31, 2015. The 10-K said that Sector 10 believed its stock was a "penny stock" that was "highly volatile," and indicated the volume of trading was "limited." The 10-K also stated, "There is a public market for our stock, but it is thin and subject to manipulation."

¶10　As for the Sector 10 stock, the trial court determined that "the issue of who owns what shares in the company is moot," relying on DeAvila's testimony that "the company's only asset is a lawsuit where attorneys were on a contingent fee basis and have withdrawn, and as a result, the lawsuit is expected to be dismissed." The court thus awarded any and all shares, interest, or value in Sector 10 to DeAvila. Brown appeals.

## ISSUES AND STANDARDS OF REVIEW

¶11　Brown advances two main contentions on appeal. First, Brown contends that the trial court erred when it treated the insurance proceeds from the Lexus as a marital asset and awarded half of the proceeds to DeAvila. She argues, in the alternative, that the collateral source rule barred DeAvila from receiving a portion of the insurance proceeds. Second, Brown contends that the trial court erred when it failed to value the Sector 10 stock at the market price of five cents per share.

¶12　District courts generally have "considerable discretion concerning property distribution [and valuation] in a divorce proceeding and their determinations enjoy a presumption of validity." *See Dahl v. Dahl*, 2015 UT 79, ¶ 119 (citation and internal quotation marks omitted); *see also Lindsey v. Lindsey*, 2017 UT App 38, ¶ 26, 392 P.3d 968. As a result, this court "will uphold the decision of the district court on appeal unless a clear and prejudicial abuse of discretion is demonstrated." *Dahl*, 2015 UT 79, ¶ 119 (citation and internal quotation marks omitted). Showing an abuse of discretion "is a heavy burden, and we can properly find abuse only if no reasonable person would take the view adopted by the trial court." *Goggin v. Goggin*, 2013 UT 16, ¶ 26, 299 P.3d 1079 (citation and internal quotation marks omitted). Additionally, "[i]n reviewing a property distribution, we will not set aside findings of fact, whether based on oral or documentary evidence, unless they are clearly erroneous, and we give due regard to the district court's superior position from which to judge the credibility of witnesses." *Dahl*, 2015 UT 79, ¶ 121. In evaluating whether the trial court correctly declined to

apply the collateral source rule, we review that decision for correctness. *Mahana v. Onyx Acceptance Corp.*, 2004 UT 59, ¶ 35, 96 P.3d 893.

ANALYSIS

I. Insurance Proceeds

¶13 Brown contends that because the Lexus was her separate property, the insurance proceeds stemming from its destruction should not have been divided between her and DeAvila. In the alternative, Brown contends that even if the Lexus was marital property, "[DeAvila] was not entitled to a share of the [insurance] proceeds under the collateral source rule." We address each argument in turn.

A.      Determination of Marital Property

¶14 Brown argues that the Lexus was her "sole and separate property," asserting that her "testimony that the Lexus was a birthday gift, coupled with the existence of the title solely in her name, should have been deemed conclusive by the trial court that the Lexus was indeed a gift and her separate property." Brown therefore contends that DeAvila is not entitled to a marital share of the insurance proceeds resulting from the car's destruction. We conclude that the trial court acted within its discretion when it deemed the insurance proceeds to be marital property subject to equitable distribution.

¶15 Utah law presumes that "marital property will be divided equally while separate property will not be divided at all." *Lindsey v. Lindsey*, 2017 UT App 38, ¶ 32, 392 P.3d 968 (citing *Dahl v. Dahl*, 2015 UT 79, ¶ 121). Utah law further "presumes that property acquired during the marriage is marital property subject to equitable distribution." *Dahl*, 2015 UT 79, ¶ 26. Indeed, "[m]arital property is ordinarily all property acquired during the marriage . . . , 'whenever obtained and from whatever source derived.'" *Dunn v. Dunn*, 802 P.2d 1314, 1317–18 (Utah Ct. App.

1990) (quoting *Gardner v. Gardner*, 748 P.2d 1076, 1079 (Utah 1988)); *see also Bradford v. Bradford*, 1999 UT App 373, ¶ 26, 993 P.2d 887 (noting that the trial court has "broad equitable power to distribute marital property, regardless of who holds title"). Separate property, in contrast, is typically a spouse's premarital property or property received by gift or inheritance during the marriage. *Dahl*, 2015 UT 79, ¶ 143; *Kimball v. Kimball*, 2009 UT App 233, ¶ 24, 217 P.3d 733.

¶16 In this case, the trial court found that the parties jointly owned four vehicles, including the Lexus, at the time of separation. Accordingly, the court treated the insurance proceeds that Brown received after the Lexus's destruction as a marital asset.

¶17 Brown has not shown error in the trial court's classification of the insurance proceeds as marital property subject to division. In support of her position, Brown cites her own testimony that DeAvila gave her the Lexus as a gift and a corrected certificate of title, which post-dated the damage to the Lexus and named Brown as the only owner. But the trial court also had before it evidence that weighed against Brown's position. For example, DeAvila testified that he bought the Lexus and believed he retained an ownership interest. The trial court also had evidence in the form of the 2009 bill of sale and the sales contract for the Lexus, both of which name DeAvila as the buyer. Additionally, the application for original title listed both DeAvila and Brown as owners of the vehicle. Because this evidence could reasonably show that DeAvila acquired the Lexus during the marriage and intended it to be a marital asset, this evidence is sufficient to support the trial court's decision. Given the trial court's considerable discretion in this area of law and in light of the record evidence, we conclude that the trial court acted within the bounds of its discretion when it applied the general presumption—that marital property is all property acquired during the marriage from whatever source derived—to the insurance proceeds of the Lexus. *See Dahl*, 2015 UT 79, ¶ 26; *Dunn*, 802 P.2d at 1317–18; *see also Barrani v. Barrani*, 2014 UT

App 204, ¶ 24, 334 P.3d 994 ("[A]n appellate court's role is not to reweigh the evidence presented at trial but only to determine whether the court's decision is supported by the evidence, leaving questions of credibility and weight to the trial court."). Accordingly, Brown has not shown that the trial court exceeded its discretion in equitably dividing the insurance proceeds.

B.     Collateral Source Rule

¶18     Brown alternatively argues that even if the Lexus was marital property, "[DeAvila] was not entitled to a share of the [insurance] proceeds under the collateral source rule." In support, she argues that the trial court should have determined "how the Lexus was destroyed" because "the only evidence presented at trial was that . . . [DeAvila] destroyed the Lexus." She further argues that "[t]he legal result of [DeAvila] destroying the Lexus . . . is that he is not entitled to any of the insurance proceeds under the collateral source rule." Thus, Brown asserts that the "trial court's order requiring her to divide [the insurance] payment with the wrongdoer who caused the damage is contrary to the collateral source rule in the same way as it would be in a tort case." DeAvila responds that the collateral source rule is a "tort principle requiring a finding of wrongdoing by a tortfeasor" and "has no application in the equitable division of marital property." Assuming, without deciding, that DeAvila was responsible for the damage to the Lexus, we conclude that Brown has not shown that the collateral source rule is applicable to the circumstances of this case.

¶19     Brown cites one Utah case in support of her argument. That case involved the tort of conversion, and the Utah Supreme Court affirmed the application of the collateral source rule to exclude from consideration bond proceeds paid to a victim whose truck had been converted. *Mahana v. Onyx Acceptance Corp.*, 2004 UT 59, ¶¶ 1, 47, 96 P.3d 893. The court explained, "The collateral source rule provides that a wrongdoer is not entitled to have damages, for which he is liable, reduced by proof that the plaintiff has received or will receive compensation

or indemnity for the loss from an independent collateral source." *Id.* ¶ 37 (citation and internal quotation marks omitted); *see also Collateral-source rule*, Black's Law Dictionary 299 (9th ed. 2009) ("The doctrine that if an injured party receives compensation for the injuries from a source independent of the tortfeasor, the payment should not be deducted from the damages the tortfeasor must pay."). Subsequent Utah case law has identified two policy rationales for the rule. *See Wilson v. IHC Hosps., Inc.*, 2012 UT 43, ¶ 31, 289 P.3d 369. "First, public policy favors giving the plaintiff a double recovery rather than allowing a wrongdoer to enjoy reduced liability simply because the plaintiff received compensation from an independent source." *Id.* (citation and internal quotation marks omitted); *accord Mahana*, 2004 UT 59, ¶ 37. "Second, the rule encourages the maintenance of insurance by assuring that a plaintiff's payments from a collateral source will not be reduced by a subsequent judgment." *Wilson*, 2012 UT 43, ¶ 31 (citation and internal quotation marks omitted).

¶20 Brown has not persuaded us that the collateral source doctrine applies here. She has not cited any precedent, either from Utah or elsewhere, that would support importing the collateral source rule from tort law into the context of family law. Nor has Brown made a compelling argument that the policy rationales behind the collateral source rule would support its application to this case. Moreover, Brown has not explained how the collateral source rule operates where, as here, the alleged tortfeasor has an ownership interest in the damaged property. *See Dahl v. Dahl*, 2015 UT 79, ¶ 141 ("[A]ppellate courts are not a depository in which [a party] may dump the burden of argument and research." (second alteration in original) (citation and internal quotation marks omitted)). We therefore conclude that Brown has not demonstrated error in the trial court's refusal to apply the collateral source rule in this case.

## II. Stock Valuation

¶21 Next, Brown contends that the trial court erred in implicitly finding that the Sector 10 stock was valueless,

asserting that the court "was not entitled to determine that shares of a publicly-traded corporation were valueless, contrary to the market price, based solely on [DeAvila's] testimony." Brown argues that the trial court could not "disregard the stock price . . . in favor of its own analysis" and that, "[a]t a minimum, expert testimony should be required if the trial court is to deviate from an open market stock price."[4] We conclude that Brown has not shown that the trial court clearly erred in finding that the Sector 10 stock was essentially worthless.

¶22    In reviewing this issue, we bear in mind that "the district court's factual findings as to the value of assets will not be disturbed unless they are clearly erroneous." *Dahl*, 2015 UT 79, ¶ 131. "A trial court's factual determinations are clearly erroneous only if they are in conflict with the clear weight of the evidence, or if this court has a definite and firm conviction that a mistake has been made." *Kimball v. Kimball*, 2009 UT App 233, ¶ 14, 217 P.3d 733 (citation and internal quotation marks omitted). Further, "[w]hen considering testimony regarding valuation of property, the trial court is entitled to give conflicting opinions whatever weight [it] deems appropriate," and a trial court's valuation will be upheld if it is "within the range of values established by all the [evidence]." *See Morgan v. Morgan*, 854 P.2d 559, 564, 566 (Utah Ct. App. 1993) (second and third alterations in original) (citations and internal quotation marks omitted); *cf. Bingham Consolidation Co. v. Groesbeck*, 2004 UT App 434, ¶ 32, 105 P.3d 365 ("[W]hen assessing a party's proposed valuation of shares, a trial court may rely on that party's trustworthiness in adopting or reject[ing] its valuation.").

---

4. In so arguing, Brown does not argue that the trial court should have awarded her a portion of the Sector 10 stock. Rather, she asserts that by awarding at least 400,000 shares to DeAvila, the trial court awarded DeAvila "a value of $20,000 at the five-cent-per-share market price, not nothing," entitling her to an appropriate adjustment in the property awarded to her.

¶23    The trial court's analysis did not expressly state the precise value of the Sector 10 stock. But the court specifically noted that DeAvila testified that "the company's only asset is a lawsuit where the attorneys were on a contingent fee basis and have withdrawn, and as a result, the lawsuit is expected to be dismissed." Due to this fact, the court deemed moot "the issue of who owns what shares in the company" and, in accordance with Brown's wishes, awarded DeAvila "any interest or value in Sector 10." The court's analysis—with its reliance on DeAvila's testimony about the stalled lawsuit and its determination that the issue of stock ownership was moot—indicates that the court implicitly rejected the idea that the Sector 10 stock could be traded at five cents or more per share.

¶24    Brown has not met her burden on appeal to show that the trial court clearly erred in implicitly finding that the Sector 10 stock was worthless. Although DeAvila testified that Sector 10 was a publicly traded company and both parties testified that the stock's current market price was five cents per share, the evidence in the record suggested the market for the stock was "thin" and thus raised questions as to whether the stock could be traded by either party for that amount. The trial court did not clearly err in implicitly finding more credible and relevant DeAvila's testimony about the company's current circumstances. DeAvila testified that Sector 10 claimed "substantial damage" in a lawsuit, but that because the company's attorneys "dropped the litigation," Sector 10 was "now going to basically file [for] bankruptcy." DeAvila further indicated that the attorneys' withdrawal from the lawsuit and the company's resulting inability to pursue its case for damages meant that Sector 10 had no value. Brown disagrees with the trial court's reliance on this aspect of DeAvila's testimony and with its ultimate finding that the stock was worthless, but she has not shown that the trial court's valuation falls outside "the range of values established by all the [evidence]." *See Morgan*, 854 P.2d at 566 (alteration in original) (citation and internal quotation marks omitted); *see also id.* at 563 ("[E]valuation of the weight and credibility of testimony and evidence is a matter for the trier of fact.").

¶25  Brown also cites the lack of expert evidence in this case and asserts that expert testimony is required if a court deviates from an open market price. But under Utah law, a knowledgeable owner generally "may testify as to the market value of property," including in divorce cases, *see Olson v. Olson*, 2010 UT App 22, ¶ 27, 226 P.3d 751 (citation and internal quotation marks omitted), and Brown has not persuaded us to adopt an expert-testimony requirement when stock is at issue. In short, Brown has not shown that the trial court clearly erred in valuing the Sector 10 stock or otherwise exceeded its discretion in awarding that stock to DeAvila.

CONCLUSION

¶26  Brown has not demonstrated that the trial court exceeded its discretion in dividing property between DeAvila and Brown. Accordingly, we affirm.

_____