2022 UT App 60

# THE UTAH COURT OF APPEALS

JAMES M. DUFFIN III,
Appellee and Cross-appellant,

*v.*

BRANDY E. DUFFIN,
Appellant and Cross-appellee.

Opinion
No. 20200361-CA
Filed May 12, 2022

Third District Court, West Jordan Department
The Honorable Matthew Bates
No. 184400962

T. Jake Hinkins and Kurt W. Laird, Attorneys for
Appellant and Cross-appellee

Martin N. Olsen and Beau J. Olsen, Attorneys for
Appellee and Cross-appellant

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN M. HARRIS
concurred.

MORTENSEN, Judge:

¶1 In prototypical fashion, a young married couple—James and Brandy Duffin[1]—set about building a new house. They prequalified for a loan, hired a real estate agent, paid a deposit of $1,000 with marital funds, entered into a contract with a builder, went to a design center to pick out finishes, and attended the closing together. However, in atypical fashion, James's father and grandfather reimbursed the $1,000 deposit, paid an additional $18,000 as a preconstruction deposit, and at closing paid the

---

1. Because the parties share the same last name, we refer to them by their given names.

balance of the purchase price of $410,875 in cash. Only James's name was placed on the deed. Months later, as James and Brandy's marriage relationship deteriorated, James deeded the property to himself and his father. A divorce action was filed, and at trial, the district court concluded, among other things, that any interest James and Brandy had in the house was not marital property and that Brandy should be awarded attorney fees. Brandy appeals, claiming that any interest she and James have in the house is a marital interest. James cross-appeals, challenging the determination on fees. We reverse the district court's determination regarding the house, but we affirm the decision regarding attorney fees.

BACKGROUND

¶2    Brandy and James were married in March 2015. They had two children during their union.

¶3    In April 2016, Brandy and James, having been approved for a loan of up to $360,000, entered into a real estate purchase agreement to purchase a house in West Jordan, Utah. Using a cashier's check from an account in his name, James paid a security deposit of $1,000 on the contract.[2] James testified that his father (Father) reimbursed him for the $1,000, though he could not remember how that reimbursement occurred.

¶4    In June 2016, James's grandfather (Grandfather) paid $18,000 for the preconstruction deposit, but James asserted that the money was actually an advance on Father's inheritance from Grandfather. At closing, Father paid the outstanding balance on

---

2. Brandy asserted that the cashier's check was funded with commingled monies from her and James. *See infra* ¶ 15. James admitted that money from Brandy's income may have gone into the account from which the cashier's check was drawn.

the home, again with money allegedly received as an advance on his own inheritance.

¶5      On February 8, 2017—the day before closing—James sent an email, titled "Loan Contract," to Father stating that Father "is dispensing a loan of $429,875.42 to purchase a home," which was identified as the house for which James and Brandy had signed the real estate purchase agreement. In that document, James identified himself as the party responsible for repayment of the loan. Notably, the Loan Contract did not mention interest or a payment schedule; rather, it provided that Father could "demand payment of this loan at anytime."

¶6      Brandy and James moved into the completed house. A warranty deed conveying title of the house from the seller to James—Brandy's name does not appear on the deed—was recorded on February 9, 2017.

¶7      About a year later, in February 2018, James added Father to the title of the house by executing and recording a new warranty deed. Brandy contended that the "marriage was struggling and divorce was a very real possibility" at the time James added Father to the title of the property.

¶8      As it turns out, Brandy and James separated in July 2018, and James petitioned for divorce in August 2018. James further asked that the assets and liabilities of the marital estate be divided equitably and that the parties bear their own attorney fees and costs.

¶9      As relevant here, in his financial declaration, submitted in October 2018, James listed the house as an asset with no amount owing, noting that it was a "[c]ash purchase" by Father and that it was acquired in his and Father's names.

¶10     In her counter-petition, in addition to addressing custody and parent-time issues, Brandy requested that the house be sold and the equity split equally. Brandy also asked for attorney fees.

¶11    James later asserted—during the divorce proceedings—that he purchased the house on behalf of Father, who lived in California, and that he was just doing the "leg work" for Father. He also asserted that he and Brandy "weren't prequalified on [their] own merits" but had used Father's bank statements in the application.[3] However, James admitted that he never informed anyone that he was acting as the agent of Father. And James conceded that he was not aware of "written documentary evidence" indicating an agency relationship but that there were "certainly conversations" between him and Father to that effect.[4] James also contended that an agreement between him and Father gave James the option to purchase the house from Father.

¶12    Father echoed much the same in his deposition on the matter, saying that he had "been talking to [James] about purchasing a home for [him] in Utah for quite some time" and that James acted on his behalf in purchasing the house. Father explicitly stated that he "[a]bsolutely" never intended the house to be a gift to James. Father clarified, "I provided all the money. My son worked as my agent in obtaining that house. And it was always understood between my son and me that that was my house." But Father admitted that there was no document that would evidence any sort of an agency relationship between them.

¶13    Father explained that his name was not on the deed to the house because he "wanted to empower" James by having him "go through the process" of purchasing a house. Father asserted that

_____

3. James's name is identical to Father's, with the exception of the suffix.

4. James acted as agent for Father for the purchase of a different "property six houses away." Indeed, the record contains another real estate purchase contract under Father's name and address (as opposed to James and Brandy's) that was signed by James. The record contains at least one piece of correspondence addressed to Father at this address.

he was involved in the design of the house and "oversaw the whole thing." But he admitted there were "no writings, no emails or text messages between the two of [them] about the house plans." Rather, Father explained, "[I]t was just a . . . casual, loving, walking down the street, arm around my son," asking, "What do you think, Jim?"

¶14 Father indicated that he needed to "subsidize the relationship [between James and Brandy] until it really got off . . . on a good start." However, Father indicated that Brandy was never involved in the conversations about the help he was extending to them: "The whole . . . financial situation, . . . my support, my allowing them to live in that house, all of that was between me and my son."

¶15 For her part, Brandy testified that there was never any discussion that the house would belong to anyone other than her and James. Specifically, she said there was never any mention made to her that the house was being built for Father or that Father had any input on the construction. She clarified that she and James "picked out all of the finishings" and the floor plan of the house. Brandy testified that at no time during construction did James ever indicate that he needed to check with Father to verify that he was "okay" with their design selections because it was going to be Father's house. In terms of paying for the house, Brandy stated that she and James were prequalified for a loan on the house, that the $1,000 deposit was paid with a cashier's check funded with money from their commingled accounts, and that she and James were present together at the closing. Brandy further testified that she and James completed the landscaping and added, among other features, a fence, basketball standard, and cement pad.

¶16 With regard to the house, the court found that it was not marital property. The court reasoned,

> The parties went into this home with the expectation that they would purchase it together. They picked the lot, they picked the design of the home, they selected trim and other finishings in the home, and they entered into a [real estate purchase agreement] with [the seller], and the parties expected that they would have a mortgage and that they would pay for this home using their respective incomes. But when it came time to actually close on this transaction, that is not what happened. Instead, [Father] paid for the home in its entirety, and James was the only one who was put on the deed.

¶17    The court went on to note that James and Brandy "lived in the home for what is a relatively short duration. They did not pay rent, they did not pay any sort of mortgage or loan, they did not pay utilities or property taxes. Those were all paid by income from [Father] towards the home." And even though James and Brandy did "contribute somewhat to the home by putting in some shrubberies, a basketball standard, putting down a concrete pad, [and] installing a small fence," the court concluded that "given the large amount of equity in this home, upwards of $450,000, those small contributions . . . [did] not convert [the house] into a marital asset."

¶18    The court concluded,

> [The house] was an asset that was titled only in James's name. It was paid for by [Father]. . . . To determine that it was a marital interest would essentially be to give to Brandy a tremendous windfall of something that was not acquired in any rational sense of the word by the efforts of the marriage or the work or efforts of the marriage. So to the extent that there is any interest in the home, it is not a marital interest and to the extent that James

has an interest in the home, it is not a marital interest.[5]

¶19 Lastly, the court awarded attorney fees to Brandy, at least in part:

> Given the parties' respective incomes, particularly that James has income a little bit more than four times the income that Brandy has, Brandy has a need for assistance in paying her attorney's fees [and] those fees were necessary for her to be able to defend herself in this divorce action. However, she did not prevail 100 percent on all of her claims[6] and everything she was seeking, so the Court hereby awards her 60 percent of her attorney's fees.

¶20 Both parties appeal, Brandy with respect to the determination that any interest she and James had in the house was not marital property, and James with respect to the award of attorney fees.

ISSUES AND STANDARDS OF REVIEW

¶21 Brandy contends that the district court erred in concluding that any interest she and James had in the house acquired during the course of the marriage was not marital property and thus not subject to distribution. "We will not disturb a property award unless we determine that there has been a misunderstanding or misapplication of the law resulting in substantial and prejudicial

---

5. The court spoke in conditional terms about the extent of interest in the house—as do we—because Father has filed a pending quiet title action asserting his interest in the property.

6. Brandy prevailed on various claims related to custody and child support.

error, the evidence clearly preponderates against the findings, or such a serious inequity has resulted as to manifest a clear abuse of discretion." *Nakkina v. Mahanthi*, 2021 UT App 111, ¶ 16, 496 P.3d 1173 (cleaned up).

¶22    In his cross-appeal, James contends that the district court erred in ordering him to pay 60% of Brandy's attorney fees pursuant to Utah Code section 30-3-3(1). "We review the district court's award of attorney fees under Utah Code section 30-3-3, including the amount of the award, for abuse of discretion." *Eberhard v. Eberhard*, 2019 UT App 114, ¶ 6, 449 P.3d 202.

ANALYSIS

I. The Status of the Parties' Putative Interest in the House as Marital Property

¶23    "Marital property is ordinarily all property acquired during marriage and it encompasses all of the assets of every nature possessed by the parties, whenever obtained and from whatever source derived." *Marroquin v. Marroquin*, 2019 UT App 38, ¶ 14, 440 P.3d 757 (cleaned up). "Separate property, in contrast, is typically a spouse's premarital property or property received by gift or inheritance during the marriage." *DeAvila v. DeAvila*, 2017 UT App 146, ¶ 15, 402 P.3d 184.

¶24    "In Utah, marital property is ordinarily divided equally between the divorcing spouses and separate property, which may include premarital assets, inheritances, or similar assets, will be awarded to the acquiring spouse." *Olsen v. Olsen*, 2007 UT App 296, ¶ 23, 169 P.3d 765. Specifically,

> When dividing property in a divorce, the court should first properly categorize the parties' property as part of the marital estate or as the separate property of one or the other. Then, the court should presume that each party is entitled to

all of that party's separate property and one-half of
the marital property, regardless of which spouse's
name appears on the title to the marital property.

*Allen v. Ciokewicz*, 2012 UT App 162, ¶ 46, 280 P.3d 425 (cleaned
up); *see also Bradford v. Bradford*, 1999 UT App 373, ¶ 26, 993 P.2d
887 (stating that marital property may be distributed equitably
"regardless of who holds title").

¶25   Here, the district court erred in its determination that
insofar as James or Brandy had a property interest in the house,
that interest was not marital.

¶26   Throughout the pendency of the divorce proceedings,
James explicitly rejected the notion that the house was a gift. And
there is no indication in the record that James received the house
as part of his inheritance. Nor was the house James's premarital
asset—it was indisputably acquired during the marriage. Thus,
there is no evidence to suggest that any interest James might have
in the house qualifies as James's separate property. *See Keiter v.
Keiter*, 2010 UT App 169, ¶ 22, 235 P.3d 782 ("Generally,
premarital property, gifts, and inheritances may be viewed as
separate property, and the spouse bringing such separate
property into the marriage may retain it following the marriage."
(cleaned up)).

¶27   But there is ample evidence that any interest James and
Brandy had in the house was marital property. Brandy and James
both signed the real estate purchase agreement. As the district
court explicitly noted, they both entered into the agreement with
the expectation that they were purchasing the house together and
that they would have a mortgage together. They picked the lot,
they paid a $1,000 deposit, they selected the design, and they
chose the finishings. The two factors that the district court pointed
to as indicating that the house was not marital property were that
James was the only one on the deed and that Father paid for the
house in its entirety. But neither of these circumstances is

sufficient to transform whatever interest James and Brandy have in the house from marital property to separate property.

¶28    First, that Brandy was never on the deed to the house in no way indicates that any interest James and Brandy might have in the house was somehow not marital property. In fact, just the opposite is true. "[A] marital asset is defined functionally as any right that has accrued during the marriage to a present or future benefit." *Jefferies v. Jefferies*, 895 P.2d 835, 837 (Utah Ct. App. 1995). By having his name entered into the warranty deed and having his name placed on the title, James obtained the house in fee simple. *See* Utah Code Ann. § 57-1-12(2) (LexisNexis 2020). And because he obtained title during the marriage—and because the house was not a gift or inherited—whatever interest he had in the house became marital property. *See Marroquin*, 2019 UT App 38, ¶ 14 (defining marital property as "all property acquired during marriage" (cleaned up)). In other words, once James acquired title, Brandy acquired title because the acquisition took place during the marriage, and there was no exception (i.e., gift or inheritance) indicating otherwise.

¶29    Second, that Father paid for the house also fails to render "nonmarital" any interest James and Brandy might have in it. As our case law makes abundantly clear, "marital property ordinarily includes all property acquired during marriage, whenever obtained and from whatever source derived." *Lindsey v. Lindsey*, 2017 UT App 38, ¶ 31, 392 P.3d 968 (cleaned up); *accord Marroquin*, 2019 UT App 38, ¶ 14; *DeAvila*, 2017 UT App 146, ¶ 15; *Dunn v. Dunn*, 802 P.2d 1314, 1317–18 (Utah Ct. App. 1990). That James and Brandy used someone else's money to purchase the house does not—standing alone—make their interest in the house nonmarital property. Most people, when they purchase a home, use someone else's money (usually a lender's) to do it—indeed, Father providing the money to purchase the house looks somewhat like just such a loan. And granted, the source of money by which the house was acquired would potentially render James's interest in the house nonmarital if Father had gifted the

money to James alone or if it represented James's inheritance. But that's not what happened here. As already noted, the record does not support a conclusion that the money was a gift to James or part of his inheritance, and the district court did not conclude otherwise.

¶30   On this note (i.e., that Father paid for the house while James and Brandy made a minimal contribution), the district court, citing *Jefferies v. Jefferies*, 895 P.2d 835 (Utah Ct. App. 1995), and *Dunn v. Dunn*, 802 P.2d 1314 (Utah Ct. App. 1990), concluded, "These cases suggest that marital property is not just any property obtained, but property that is obtained through the efforts of the marriage, and suggests that a windfall to one party or the other may not necessarily be marital property." From this "suggestion" that it perceived in these two cases, the district court concluded that James and Brandy did not contribute sufficiently to the house to make any interest they might have in it marital property.

¶31   But obtaining property "through the efforts of the marriage" is not the defining condition that makes property marital; rather, it is the mere acquisition of property during marriage. As this court has often repeated, "marital property ordinarily includes all property acquired during marriage, whenever obtained and from whatever source derived." *Lindsey*, 2017 UT App 38, ¶ 31 (cleaned up). Our case law nowhere mentions "the efforts of the marriage" as being necessary to making property so acquired marital. Thus, acquisition—from whatever source—during the marriage is the hallmark condition that renders property marital, not the maintenance or growth of that property by the efforts of the parties. To be clear, our case law employs the modifier "ordinarily" to account for the situation where property acquired by "gift or inheritance during the marriage," *see DeAvila*, 2017 UT App 146, ¶ 15, remains separate property unless it has been transformed to marital property by commingling or the contribution of the non-receiving spouse, *see Keyes v. Keyes*, 2015 UT App 114, ¶ 28, 351 P.3d 90 (stating that "separate property, which may include premarital assets,

inheritances, or similar assets, will be awarded to the acquiring spouse" unless it loses "its separate character . . . through commingling or if the other spouse has by his or her efforts or expense contributed to the enhancement, maintenance, or protection of that property" (cleaned up)). Thus, the district court's misstep here was in applying the concept of "the efforts of the marriage" as a condition for all property acquired during the course of a marriage to become marital, when our case law has limited that concept to the efforts of the non-receiving spouse in transforming separate property into marital property.

¶32   In sum, we reverse the district court's determination that the couple's property interest in the house, insofar as they had an interest, was not marital. The extent to which Brandy and James even have an interest in the property is an issue that will be decided in the separate lawsuit. *See supra* note 5. But to the extent they are adjudicated to have an interest in the house, that interest is marital property subject to equitable distribution between them.

## II. The Award of Attorney Fees

¶33   On appeal, James asserts that the district court erred in awarding Brandy attorney fees because it did not make a detailed factual analysis of either Brandy's financial need for assistance or James's ability to pay and because the district court took into account whether Brandy prevailed on her claims. These challenges raise different legal theories from the ones James raised below with regard to Brandy's attorney fees request.

¶34   "Parties are required to raise and argue an issue in the [district] court in such a way that the court has an opportunity to rule on it." *State v. Johnson*, 2017 UT 76, ¶ 18, 416 P.3d 443 (cleaned up). "When a party fails to raise and argue an issue in the district court, it has failed to preserve the issue, and an appellate court will not typically reach that issue absent a valid exception to preservation." *Issertell v. Issertell*, 2020 UT App 62, ¶ 21, 463 P.3d 698 (cleaned up). "As to preservation, our case law draws a

distinction between new 'issues' (like distinct claims or legal theories) and new 'arguments' in support of preserved issues (such as the citation of new legal authority)." *Hand v. State*, 2020 UT 8, ¶ 6, 459 P.3d 1014.

¶35 Here, James is clearly trying to raise new issues. Below, James did not challenge the court's analysis regarding Brandy's financial need or his ability to pay. In fact, James explicitly challenged only the inclusion of fees associated with a protective order, the exclusion of certain reimbursements Brandy had received, the court's handling of rule 54(d) of the Utah Rules of Civil Procedure as it applies to costs, and the exclusion of the costs James had paid for a custody evaluation. Nowhere did he assert that the court should not award Brandy attorney fees due to his or Brandy's financial situation. In short, the legal theories he raised below in challenging Brandy's attorney fee request were entirely different from the legal theories he attempts to raise now. He simply never gave the district court an opportunity to rule on the theories he now advances.

¶36 Because James failed to raise the same challenges to Brandy's request for attorney fees that he is attempting to raise on appeal, his current challenges are unpreserved, and James does not ask us to apply any of the traditional exceptions to our preservation requirement.[7] On that basis, we decline to review the

---

7. James argues that the court plainly erred in awarding attorney fees. But after his brief was submitted, this court held "that plain error review is not available in ordinary civil cases." *See Kelly v. Timber Lakes Prop. Owners Ass'n*, 2022 UT App 23, ¶ 44, 507 P.3d 357. Accordingly, the plain error exception to our preservation rule does not apply to this situation.

James also argues that "rare procedural anomalies . . . prevented [him] from fully providing the [district court] the legal arguments and evidence to support the denial of Brandy's request for attorney fees." The "rare procedural anomaly" James

(continued…)

merits of James's unpreserved challenges to the award of attorney fees.

CONCLUSION

¶37    Having concluded that to the extent the couple had a property interest in the house, the interest was marital, we reverse and remand for further proceedings consistent with this opinion. And we uphold the award of attorney fees to Brandy because the legal theories advanced on appeal were not preserved.

_____

identifies is the court's statement that it was "very familiar with the state of the law with respect to attorneys fees under 30-3-3" such that it did not need "further briefing on this matter." James argues that precluding him "from putting forth evidence and appropriate briefing rises to the level of an anomaly in the proceedings." But we see no procedural anomaly that would have prevented James from raising the issue in a post-judgment motion, just as he did with his other challenges to the award of attorney fees.