2023 UT App 16

# THE UTAH COURT OF APPEALS

SHONDELL SWENSON KNOWLTON,
Appellee,
*v.*
BRADLEY LEWIS KNOWLTON,
Appellant.

Opinion
No. 20200483-CA
Filed February 9, 2023

Second District Court, Farmington Department
The Honorable David M. Connors
No. 174701016

Julie J. Nelson, Troy L. Booher, and
Alexandra Mareschal, Attorneys for Appellant

Jon M. Memmott, Shaun L. Peck, and
Shawn P. Bailey, Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and
RYAN M. HARRIS concurred.

ORME, Judge:

¶1      This appeal arises from the divorce of Bradley Lewis Knowlton and Shondell Swenson Knowlton. Bradley challenges various aspects of the trial court's valuation and equitable division of marital property, its reconciliation of expenses, and its determination that Shondell was not in contempt of court.[1]

---

1. Because the parties share the same last name, we follow our usual practice of referring to them by their first names, with no disrespect intended by the apparent informality.

Because the court did not abuse its discretion in any of these respects, we affirm.

## BACKGROUND

¶2 Bradley and Shondell separated in 2017 after 41 years of marriage. In August of that year, they entered a stipulated temporary order (the Temporary Order), which was then signed by the court. The Temporary Order governed how their substantial marital estate was to be treated during the pendency of the divorce proceeding. In July 2019, the trial court entered a bifurcated decree of divorce, dissolving the parties' marriage but reserving all other issues for trial "and continuing, unaltered," the Temporary Order.

¶3 The court held a fourteen-day bench trial over the course of multiple dates between May and November 2019 to value and divide the marital estate. It was undisputed that nearly all the parties' assets belonged to the marital estate and were subject to equitable division. We now discuss each asset bearing on an issue before us on appeal.

*Ascent Construction, LLC*

¶4 Ascent Construction, LLC (Ascent) is a private construction company Bradley founded during the marriage. Bradley is the "primary officer of Ascent Construction and continues to be active in its day to day business." In May 2018, the parties agreed to "jointly hire and retain" an expert (Ascent Expert) to prepare a "Fair Market Value of Ascent" and to value the parties' ownership interests in Ascent. The parties stipulated that "[t]he valuation date will be as of the most current, complete financial information available for" Ascent, and that it was "expected that such information will be as of December 31, 2017, or more current." Ascent Expert issued his report with a valuation that was current as of December 31, 2017.

¶5    Based on Ascent Expert's conclusion that Bradley held a 50% ownership interest in Ascent, the parties stipulated to value the ownership interest at $2,157,000. The parties further agreed that the asset should be awarded to Bradley.

¶6    In March 2019, Shondell moved to update Ascent Expert's valuation of Ascent on the grounds that "the valuation will be roughly 1.5 years out of date at the time of trial" and that the court had not ruled that a valuation date other than the time of trial was appropriate. In mid-May 2019, the court ruled that it was "appropriate for [Ascent Expert] to update his valuation of Ascent to the extent reasonably possible for purposes of the trial." The court ordered the parties to "jointly ask [Ascent Expert] to update the valuation and provide him with any information that he reasonably needs." The court further instructed Ascent to "produce the information and documents requested by [Ascent Expert], including any partial or preliminary materials." In the event "Ascent claims materials requested by [Ascent Expert] do not exist," the court directed that "as to any accounting or financial information, Ascent's accountant . . . must provide a sworn statement specifically identifying which of the materials requested by [Ascent Expert] do not exist and why they do not exist."

¶7    A week later—two days before trial was to begin—Ascent's accountant filed an affidavit stating that most of the financial documents Ascent Expert requested were not available—some because they were "[n]ot yet finalized." On the first day of trial, Ascent's accountant was questioned extensively regarding the requested documents. Ultimately, the issue of whether the valuation of Ascent could be updated remained unresolved.

¶8    Later that day, the parties resolved this dispute by entering a second stipulation (the May 2019 Stipulation) in the course of the following exchange:

MR. PECK[2]: [I]n light of where we are actually at [in] the case, with time that is available to us, and in light of the difficulty, I think, it would impose on [Ascent Expert] to try and do his work . . . [Shondell] offers as a stipulation to accept the 2017 year-end value in the case with no further questioning about the issue.

And to the extent that opposing counsel is willing to agree to that stipulation as well, I think we will just proceed on the 2017 valuation. We can waive calling [Ascent Expert] since that report has already been stipulated to. . . .

So with that in mind, I think that's what we offer to do.

THE COURT: You're offering as a stipulation? Is there a stipulation or—

MR. PECK: Well, [Ascent Expert's] report is already stipulated as to 2017.

THE COURT: Well, I know that. I know that part. But I was trying to figure out if the rest of it has been stipulated.

MR. PECK: The stipulation, in essence, is let's let go of the rest of the issues on that, and let's proceed with the information that's already been stipulated as to the value of 2017, and we're okay with that. We will simply ask no more questions about that and just rely on [the] 2017 valuation by [Ascent Expert].

---

2. Shondell's attorney.

THE COURT: Mr. Rudd?[3]

MR. RUDD: No objection. We're comfortable with that. It's the agreement of the parties as well. So no.

THE COURT: Okay. Well, with that in mind, I'm good with that too. So essentially what we're saying is [Ascent Expert's] already stipulated to . . . report regarding the 2017 valuation will be the valuation we'll use on this asset for this trial.

MR. PECK: Yes.

MR. RUDD: And we would ask that his report be received in evidence.

THE COURT: Is there any objection?

MR PECK: No.

THE COURT: All right. So his report will be received into evidence. All right. Thank you.

The parties thus agreed to cease further inquiry into whether Bradley complied with the court's order and to use Ascent Expert's existing, un-updated 2017 valuation of the marital estate's ownership interest in Ascent at trial.

¶9     But in her written closing argument, Shondell argued that despite the stipulated valuation of $2,157,000, Ascent should instead be valued at $2,396,000 because Ascent Expert applied a 10% "lack of control discount" to the 2017 valuation. She asserted that Bradley testified "three different times" at trial that he owned a controlling interest in Ascent. Accordingly, she contended that the 10% discount should be removed. Bradley argued for enforcement of the May 2019 Stipulation, insisting that they had

---

3. Bradley's attorney.

already "stipulated to both the value ($2,157,000) and the distribution of Ascent" to him.

¶10 In October 2019—in the midst of the ongoing trial—an Ascent client filed a complaint against Ascent, alleging claims based in contract and tort and seeking damages in excess of $38 million. In late-February 2020—after the trial in the present case had already concluded but before the court issued its ruling—"the sureties issuing the performance bonds for Ascent Construction . . . sent a formal demand letter from their attorney . . . demanding that Ascent Construction together with Brad and Shondell jointly and severally indemnify the Sureties for up to $40 million in performance and payment bond claims."

¶11 In response, Bradley changed his position on the inviolability of the May 2019 Stipulation and filed an expedited motion to update the valuation of Ascent. He asserted that this indemnity demand "will dramatically affect the valuation of Ascent Construction, and it may affect the personal liability of both Brad and Shondell tremendously" and "it therefore will affect the value of the marital estate in a correspondingly dramatic manner." Shondell opposed the motion, now arguing that the May 2019 Stipulation was binding and should not be revisited. She also argued that Bradley was aware of the underlying dispute as early as October 2019 but did not present that information at trial despite having an opportunity to do so.

¶12 In its trial ruling, issued in April 2020, the court first addressed Shondell's request that the valuation of Ascent be increased by 10%. The court held that the May 2019 Stipulation "as to the value of the marital interest in Ascent Construction did not leave room for Shondell to now argue for a different valuation, even if that different valuation is still based on [Ascent Expert's] valuation report." And although "subsequent testimony regarding Brad's percentage interest in Ascent Construction is not entirely clear and it would be difficult to reach a conclusion on whether that interest is exactly 50%, as Brad says, or is slightly more than 50%, as Shondell now claims[,] . . . there is no ambiguity

in the stipulation reached by the parties and announced in open court at the outset of trial."

¶13 Next, the court denied Bradley's expedited motion to update the valuation of Ascent. The court stated that because "there was no stipulation by the parties to the possibility that the stipulated value of Ascent Construction might change between the date of the valuation (December 31, 2017) and the date of the divorce decree," it was "persuaded that the [May 2019 Stipulation] to the Value of Ascent Construction purported to fix the value of the asset for all purposes related to the equitable division of the parties' marital property." Indeed, the court noted that the specific issue of whether the value of Ascent needed to be updated was raised before trial and, following additional discovery, the parties entered the May 2019 Stipulation providing that "the 2017 valuation will be the valuation we'll use on this asset for this trial." Accordingly, the court valued Ascent at the stipulated value of $2,157,000 in its division of assets.

¶14 Bradley moved to amend the ruling and for a limited new trial on the basis of "newly discovered material evidence," i.e., the sureties' collection efforts against Ascent. The court denied Bradley's motion to alter or amend on the grounds that Bradley had advocated for the binding nature of the May 2019 Stipulation during trial when it suited his interest and that the complaint against Ascent was brought while the trial was still ongoing but Bradley did not bring the complaint to the court's attention at that time.

*Tax Increment Funds*

¶15 Bradley was also an owner of OBE Vision, LLC (OBE). In 2015, Ascent began building properties in Ogden, which were owned by OBE. Over the next three years, Ascent billed OBE over $7,000,000 in construction services on the project. In 2018, Bradley made a capital call on OBE, which resulted in litigation over Bradley's ownership interest in the business. The parties to that litigation reached a settlement later that year, in which Bradley

became entitled to, among other things, $1.7 million in Tax Increment Funds (the TIF Funds) that were to be paid by Ogden City.[4]

¶16 The $1.7 million award in TIF Funds consisted of two components: (1) $600,000 that accrued interest at 7%—with approximately $73,500 in interest having already accrued by the time of trial—and (2) $1.1 million that did not accrue interest. Ogden City was to pay the TIF Funds during the tax increment period,[5] which was originally expected to end in 2033 but was later extended to at least 2038. Payment on the second portion of the TIF Funds was contingent on the occurrence of certain events and therefore carried a risk that the tax increment period would expire before the second portion was paid in full.

¶17 Each party retained an expert to value the TIF Funds. The expert Bradley hired (Bradley's Expert) valued the TIF Funds at $1.7 million, their face value, without offering a specific valuation for the two portions that made up the TIF Funds. He determined that no discount was warranted on the second portion of the TIF Funds based on the 7% interest accruing on the first portion and

---

4. As we glean from the record, TIF Funds are monies that Ogden City receives from an economic development project area, a portion of which it may pay to a developer to incentivize economic development in the area. TIF Funds are "generally calculated as the positive difference between the total 'base year' or pre-development ad valorem real property and personal property taxes . . . in regards to the Project and the post-development Property Taxes for the Project for each year going forward during the Tax Increment Period."

5. According to the applicable contract, "Tax Increment Period means the years during which the Economic Development Project Area will exist and" during which Ogden City is entitled to receive TIF Funds.

based on Ogden City's "AAA" bond rating that rendered it a "virtually risk-free investment."

¶18 The expert Shondell hired (Shondell's Expert) discounted the value of the second component of the TIF Funds based on several factors, including inflation, his estimation that payment on the second portion would not begin for another ten years and would take approximately four years to be paid off, the risk of non-payment based on "substantial uncertainties that remain with the project," and the lack of interest accruing on the second component. Accordingly, Shondell's Expert applied an annual 7% discount to the second portion, which consisted of 3% for inflation and 4% for risk. This resulted in a valuation of $506,665 for the second portion of the TIF Funds.

¶19 The court determined that neither expert was more qualified than the other to conduct "a discounted analysis of a future payment stream." But the court ultimately rejected the valuation offered by Bradley's Expert, stating that the valuation "is not supportable as to this asset" because the second portion of the TIF Funds "does not bear interest, carries some risk of non-payment, and will not even begin to pay out until well into the future, perhaps five or more years from now." The court determined a risk of non-payment existed because payment was "subject to many contingencies" and because "Ogden City is not a guarantor of the payment stream." Concerning the latter, the court stated the TIF Funds "come from property tax payments made by owners, or future owners, of the property included in the [development project]" and "Ogden City's obligation is simply to be sure the payments, if received, are disbursed in accordance with the governing disbursement agreement." Therefore, the court determined that Ogden City's bond rating was "not directly material to the valuation of this asset."

¶20 In sum, the court determined "that a discount must be applied in arriving at a proper valuation of the income stream." Because there was no other competing discounted valuation, the court adopted the $506,665 valuation set by Shondell's Expert,

which the court thought was "much more consistent with the reality of the delayed realization of payments and other potential risks." The court awarded the TIF Funds to Shondell, setting a combined value of both portions of the asset at $1,106,665 ($600,000 plus $506,665).

*Jordan River Marketplace, LLC*

¶21    Jordan River Marketplace, LLC (JRM) was a business entity belonging exclusively to Bradley and Shondell. At the time of trial, JRM's sole asset was a potential recovery from a lawsuit against West Valley City. Neither party provided an expert valuation of JRM or of its lawsuit.[6] Bradley testified that the lawsuit "still has value" and "still has merit," although he had already spent in excess of $400,000 in attorney fees. There was also testimony that JRM owed Ascent $88,403, although no other record evidence of this debt was presented at trial.

¶22    Both parties requested that any award recovered from the lawsuit be split equally. Bradley further requested that they similarly split any fees or costs incurred during the litigation, while Shondell requested that they equally split only any recovery of attorney fees or costs JRM might be awarded in the litigation. Shondell also asked for the authority to negotiate directly with West Valley City relating to her 50% interest in the litigation.

¶23    After noting that Bradley "has much more confidence that the litigation will ultimately be successful" than Shondell and that Shondell "seems unwilling to fund the costs of future litigation,"

---

6. Instead, each party's expert recommended that they wait until the litigation is resolved and then equally split the recovery, if any. The court rejected this suggestion, stating that it would result in inappropriate "future entanglement between the parties" because it "would require both parties to be involved in decision-making and both parties to find some way to agree on how to fund the ongoing costs of litigation."

the trial court awarded JRM in its entirety to Bradley. The court reasoned that "[t]his avoids future entanglement between the two parties as to this asset and will allow Brad to make decisions about whether and to what extent to invest his own funds into covering future litigation costs." Additionally, due to "the significantly speculative nature of any recovery," the court assigned JRM a nominal value of $100. The court further held that Bradley alone would be responsible for any prior and future costs of litigation and ordered Bradley to indemnify Shondell against any claim JRM might have against her related to its legal expenses.

¶24   In a post-trial motion, Bradley argued that the court's $100 valuation of JRM failed to address the $88,403 debt the company owed to Ascent and that he was therefore "being inequitably burdened with an additional $88,403 in debt that [Shondell] was not." The court rejected this argument, stating that it did not overlook the debt when it valued JRM at only $100. It noted that Bradley's request that it assign JRM a negative value made little sense and was against the weight of the evidence in light of Bradley's testimony that the litigation "had sufficient value to justify continued payment of attorney fees and other costs associated with that litigation." Accordingly, the court stated that "[t]he low nominal valuation of JRM at $100 represents the Court's balancing of the $88,403 liability of JRM against Brad's view that JRM's claims had significant future value." The court concluded that, in any event, "since both Ascent and JRM were awarded to Brad, the payable did not change the total valuation of the assets awarded to Brad."

*Premature Partial Distributions*

¶25   The Temporary Order allocated $840,000 as "an equal premature partial distribution to each party from the marital estate." It further provided "that funds held in other bank accounts will be subject to review, reconciliation and equalization during the disclosure and discovery process." Additionally, in October 2017, Bradley received a distribution of $78,834 for his interest in a marital property. Bradley's former counsel emailed

Shondell's counsel, stating that half of that amount would be delivered to Shondell "as a distribution in part of [her] portion of the marital estate." This resulted in each party receiving, by stipulation, a total of $879,417 in premature partial distributions.

¶26    Shondell used her premature partial distributions to purchase two homes and a vehicle. Bradley also purchased a vehicle and placed $802,000 into the account of another one of his businesses in "an attempt to ensure that Shondell would not have access to the funds." Bradley testified that he then transferred $150,000 from that business account to cover JRM's legal expenses. But because he also used $140,000 from another source to purchase another vehicle, to avoid "a lengthy discussion of whether the purchase of that vehicle was or was not a dissipation of marital funds," the court treated the funds used to purchase the vehicle as coming from Bradley's premature partial distributions instead of the funds used for JRM's legal expenses. Bradley also spent an unspecified amount of his premature partial distributions on two vehicles, an engagement ring for his new wife, their wedding reception, and their honeymoon.

¶27    At trial, Bradley argued that the homes Shondell acquired using her premature partial distributions belonged to the marital estate and that he was therefore entitled to a share of the appreciation on those properties. The court held that because the language of the Temporary Order and of the October 2017 email between counsel was clear that "the proceeds of these premature partial distributions are the parties' separate property," the homes Shondell purchased with her premature partial distributions were her separate property, and Bradley was not entitled to any portion of the appreciation on those homes.

*Idaho Cabin and $15,000 Monthly Allowance*

¶28    The Temporary Order also provided that the parties would share the use of a cabin located in Idaho that was marital property. The order directed Bradley to "advance the ongoing expenses associated with the cabin subject to equalization upon final

distribution of the parties' property." Following trial, the court awarded the cabin to Shondell but made Bradley "liable for the payment of all utilities, services, and/or insurance associated with the . . . Cabin until the date of entry of the Judgment and Decree of Divorce."

¶29 The Temporary Order also stated that each party was entitled to $15,000 per month in income from the marital properties and investments and that Bradley "shall continue to operate the respective businesses in which the parties have interests in the same manner as such businesses have been operated in the past." Shondell claimed that between June 2017 and December 2019, Bradley received over $3 million in income from the marital estate—approximately $102,000 per month—and urged the court to conduct an equalization review of the income Bradley received during the pendency of the divorce case.

¶30 The court rejected Shondell's request. It held that, with some notable exceptions, "the amounts [Bradley] received in excess of the funds he used to pay his own expenses and to make required payments to Shondell were generally used to support the marital assets." And "where it was demonstrated that Brad used funds in a way that dissipated marital property, the Court has already factored that into its equitable division of marital property" by counting those amounts as marital property already received by Bradley. Accordingly, the court reasoned that "[t]o now perform an additional 'equalization of income' as requested by Shondell would result in double-dipping for Shondell, at least as to those amounts." Lastly, the court stated that because it had "not been presented with detailed information about how each party's expenditures during the divorce proceedings compared to the marital standard of living," the court did "not have all the information it would need to do that analysis."

¶31 Relatedly, when Bradley argued that the court failed to reimburse him for the cabin-related expenditures he made, the court denied his request for reimbursement, stating that it had already given him "credit for using excess marital funds to pay

cabin expenses." The court further noted that "Brad never presented any evidence at trial suggesting that he paid any cabin expenses out of his separate property."

*Dissipation of the Marital Estate*

¶32    During the pendency of the divorce, Bradley used $564,100 of marital funds to pay his legal expenses in the divorce proceeding. No evidence was presented that Bradley made available to Shondell any marital funds—other than the $15,000 monthly payments he was required to make under the Temporary Order—to similarly cover her legal expenses. Because Bradley's use of these marital funds to pay his own legal expenses did not serve a marital purpose, the court held that Bradley dissipated the marital estate and held him accountable by treating the $564,100 "as marital assets already received by Brad."

¶33    During the divorce proceedings, Shondell did not provide bank statements or other means of valuing two of her business entities as required by rule 26.1(c) of the Utah Rules of Civil Procedure. The court assigned each of those entities a nominal value of $100. It reasoned that the first entity, which "Shondell used from time to time when doing counseling services for private clients," had "little, if any, value as an entity" because it "is simply a personal service that only generates revenues when Shondell is actively doing counseling." And neither party provided a valuation for the second entity, which "may also have been used by Shondell from time to time as an entity through which she did some business."

¶34    Bradley also argued that Shondell failed to disclose her monthly expenditures and dissipated the marital estate by not working as a counselor during the pendency of the divorce. The court rejected these arguments. It stated that Shondell was not required to disclose her monthly expenses because it was not awarding alimony or child support in this case. It further held that Shondell had not dissipated the marital estate because, for the

past several years, Shondell had not maintained an active counseling practice.

¶35　In a post-trial motion, Bradley argued that the court's dissipation ruling insofar as it related to his legal expenses "treated the parties differently" because it punished him for disclosing his expenditures—including his legal expenses—and rewarded Shondell for not doing the same. Alternatively, he argued that the court's dissipation ruling failed to credit Bradley for the $15,000 monthly payments made under the Temporary Order. The court declined to revisit these issues, stating that because Bradley had "virtually unfettered access to the marital funds during the pendency of the divorce proceedings," it took into account the parties' "very different financial positions" when it attempted "to fairly and equitably address the obvious imbalance in the fact that Brad . . . used $564,100 of these funds to pay his own legal fees and costs while providing no similar amount of marital funds to Shondell to pay her equally large legal fees and costs."

*Home Equity Line of Credit*

¶36　In November 2019, on the final day of trial, the court ordered that until it issued its trial ruling, neither party was to do anything to devalue the marital assets; that "[t]here certainly should be no extraordinary transactions outside the ordinary course of business"; and that the Temporary Order was to remain in place, which included Bradley's obligation to maintain the marital estate and to make the $15,000 monthly payments to Shondell.

¶37　In February and March 2020, Bradley withdrew a total of $78,000 from the home equity line of credit (the HELOC) on the parties' marital home. In response, Shondell filed an "Emergency Motion to Prevent Brad from Disposing of, Encumbering, and/or Devaluing Marital Assets." Bradley responded that he withdrew the funds from the HELOC to meet his obligations under the Temporary Order. Specifically, he

stated he did not receive an expected payment from one of his business entities but was required to pay a property tax obligation on the marital home and to continue to pay Shondell $15,000 per month. Shondell disputed Bradley's claims, asserting that he had "ample resources to make the required monthly payments without taking improper, unauthorized withdrawals from the parties' HELOC."

¶38 The court ordered Bradley to repay the amounts he withdrew and any applicable interest from his share of the marital assets or from his personal funds within 30 days. After Bradley raised the issue again in his post-trial motion, the court stated that Bradley made the withdrawals "long after the trial had concluded, and long after the Court had specifically instructed the parties not to make any extraordinary withdrawals without consent of the other party or approval of the Court" and that "if Brad had no other way to pay the property taxes on the marital residence but for a HELOC withdrawal, Brad should have sought consent or approval from the Court first." Accordingly, the court denied his request for a new trial on that issue.

*Contempt*

¶39 The parties were required to amend their 2015 tax return due to a failed 1031 exchange.[7] As a result, the parties incurred a significant joint federal tax obligation. After Bradley failed to pay the obligation, and after receiving multiple notices from the IRS, Shondell, on the advice of her accountants, withdrew $80,000 from ShoniK, LLC—a marital business entity of

---

7. "A 1031 exchange is a swap of one real estate investment property for another that allows capital gains taxes to be deferred." Robert W. Wood, *What is a 1031 Exchange? Know the Rules: How Savvy Investors Use 1031s to Defer Capital Gains and Build Wealth*, Investopedia, https://www.investopedia.com/financial-edge/0110/10-things-to-know-about-1031-exchanges.aspx [https://perma.cc/73Y5-K5RH].

which she was a co-manager—to pay the obligation. Bradley subsequently sought a finding of contempt against Shondell, arguing that she violated the Temporary Order, which prohibited the parties "from selling, encumbering, secreting, or disposing of the assets of the parties without written approval of the other party or of the court."

¶40 The court declined to hold Shondell in contempt, stating that based on the totality of the circumstances, it was unable to "conclude that Brad has proven, by clear and convincing evidence, that Shondell knowingly and intentionally violated the provisions" of the Temporary Order. The court based its decision on the following factors: the funds were used to pay a marital debt; a few years earlier, Bradley had also made a similar withdrawal from ShoniK to pay off the Idaho cabin; Shondell did not hide the withdrawal from Bradley; provision had already been made for the return of the funds from an expected tax refund; and Shondell acted on the advice of her accountants.

¶41 In response to Bradley's post-trial motion urging it to reconsider its decision, the court reiterated that it "cannot conclude that Brad has proven, by clear and convincing evidence, that Shondell knowingly and intentionally violated the provisions" of the Temporary Order. The court added that "[t]here is nothing in the [Temporary Order] that prohibits Shondell from continuing to act as co-manager of ShoniK, that removes her as co-manager, or that removes her as signatory on ShoniK's accounts." The court further stated that while it "may not believe" that either party's withdrawal of ShoniK funds "were entirely appropriate" because they were not the only members of ShoniK, "the parties and their accountants have found ways to make the other members whole, and the Court cannot conclude that Shondell's actions were clearly in violation of" the Temporary Order. The court thus declined for a second time to make a finding of contempt against Shondell.

¶42 Bradley now appeals.

## ISSUES AND STANDARDS OF REVIEW

¶43 Bradley challenges the court's valuations of Ascent, the TIF Funds, and JRM. He also challenges certain aspects of the court's ultimate distribution of the marital estate.[8] In a divorce proceeding, the trial court is accorded "considerable discretion" in its valuation and equitable distribution of marital property. *See Wadsworth v. Wadsworth*, 2022 UT App 28, ¶ 39, 507 P.3d 385 (quotation simplified). *See also Marroquin v. Marroquin*, 2019 UT App 38, ¶ 14, 440 P.3d 757 ("In a divorce proceeding, determining and assigning values to marital property is a matter for the trial court and this court will not disturb those determinations absent a showing of clear abuse of discretion.") (quotation simplified); *Jensen v. Jensen*, 2009 UT App 1, ¶ 6, 203 P.3d 1020 (stating that an appellate court will overturn a trial court's property distribution only if "such a serious inequity has resulted as to manifest a clear abuse of discretion") (quotation simplified). A trial court abuses its discretion "only if no reasonable person

---

8. Additionally, Bradley challenges the trial court's order requiring him to pay back the $78,000 unauthorized withdrawal from the HELOC, plus interest. However, following enforcement proceedings, in July 2021—after Bradley filed an Amended Notice of Appeal in this case—the court entered judgment related to the HELOC withdrawals against Bradley, which he subsequently satisfied in full. In the absence of any indication in the record that Bradley satisfied the judgment under protest, his appeal of this issue is moot and we do not address it further. *See Diderickson v. State*, 2022 UT 2, ¶ 26, 506 P.3d 519 ("A satisfaction of judgment is a legal determination indicating that the controversy has become moot and the right to appeal is barred.") (quotation simplified); *Scott Anderson Trucking Inc. v. Nielson Constr.*, 2020 UT App 43, ¶¶ 20–21, 462 P.3d 822 (stating that "if a judgment is voluntarily paid, which is accepted, and a judgment satisfied, the controversy has become moot and the right to appeal is waived" unless the "judgment debtor's intention of preserving his right to appeal is made to appear clearly on the record") (quotation simplified).

would take the view adopted by the trial court." *Gardner v. Gardner*, 2019 UT 61, ¶ 18, 452 P.3d 1134 (quotation simplified).

¶44 Bradley next argues that the trial court erred as a matter of law when it held that under the terms of the Temporary Order, the premature partial distributions awarded to each party thereupon became their separate property. Because divorce stipulations are interpreted "according to established rules of contract interpretation," *Thayer v. Thayer*, 2016 UT App 146, ¶ 17, 378 P.3d 1232 (quotation simplified), we review a trial court's interpretation of a stipulation for correctness, *Brady v. Park*, 2019 UT 16, ¶ 29, 445 P.3d 395.

¶45 Finally, Bradley argues that the court erred in declining to hold Shondell in contempt for violating the Temporary Order when she withdrew funds from ShoniK to pay a marital tax obligation. "The decision to hold a party in contempt of court rests within the sound discretion of the trial court and will not be disturbed on appeal unless the trial court's action is so unreasonable as to be classified as capricious and arbitrary, or a clear abuse of discretion." *Wadsworth*, 2022 UT App 28, ¶ 40 (quotation simplified).

ANALYSIS

I. Valuation of Assets

A.    Ascent

¶46 Bradley argues that the trial court abused its discretion when it refused to set aside the May 2019 Stipulation and refused his request to update the valuation of Ascent after unforeseen events "severely diminished" its value.[9] He

---

9. Bradley also contends that the trial court erred in failing to make findings addressing his argument that changed

(continued…)

asserts that "the court was required to consider" the effect of the sureties' demand letter "when it divided the marital estate, particularly since the resulting property division is grossly inequitable."[10]

---

circumstances rendered the May 2019 Stipulation inequitable. In support of this argument, he cites *Chandler v. West*, 610 P.2d 1299 (Utah 1980), which states that a trial court may commit reversible error when it "decline[s] to modify . . . a stipulated property settlement between the parties without an explanation as to why those [changed] circumstances did not warrant a modification." *Id.* at 1301. *See id.* ("[W]hen a party . . . presents a prima facie case of changed circumstances which basically raises a serious question as to fairness and equity of continuing the financial obligations of one party, the court's determination that modification of a decree is nevertheless inappropriate should be based on written findings and conclusions."). But here, the court stated that it did "not see how [the sureties'] collection efforts represent newly discovered evidence" because Ascent's client filed a complaint against Ascent seeking in excess of $38 million while the trial in the current case was still ongoing, but Bradley did not bring it to the court's attention at that time. Accordingly, because the court held that the sureties' subsequent demand letter did not amount to changed circumstances—which holding Bradley has not meaningfully challenged on appeal—the court was not required to make findings as to why the alleged changed circumstances did not warrant modification of the May 2019 Stipulation.

10. Shondell argues that Bradley did not preserve his argument that the May 2019 Stipulation was inequitable. But because we resolve this case on the merits in Shondell's favor, we need not address her preservation argument. *See State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415 ("If the merits of a claim can easily be resolved in favor of the party asserting that the claim was not preserved, we readily may opt to do so without addressing preservation.") (quotation simplified).

¶47 "Parties are generally free to agree upon facts subject to judicial application of the law," which in most cases "should be welcomed as an exercise entirely consistent with efficient and just judicial administration." *Batty v. Batty*, 2006 UT App 506, ¶ 2, 153 P.3d 827 (quotation simplified). Thus, "so long as they are negotiated in good faith and do not unreasonably constrain the divorce court's equitable and statutory duties," *Ashby v. Ashby*, 2010 UT 7, ¶ 21, 227 P.3d 246 (quotation simplified), stipulations regarding property distribution "should be respected and given great weight," *Batty*, 2006 UT App 506, ¶ 2 (quotation simplified). *See Nave-Free v. Free*, 2019 UT App 83, ¶ 6 n.4, 444 P.3d 3 ("With regard to property settlements, stipulations entered into in contemplation of a divorce are conclusive and binding on the parties unless, upon timely notice and for good cause shown, relief is granted therefrom.") (quotation simplified). In sum, "a stipulation will ordinarily be enforced unless the court finds it to be unfair or unreasonable." *Robinson v. Robinson*, 2010 UT App 96, ¶ 13, 232 P.3d 1081 (quotation simplified).

¶48 Before the trial court, Bradley cited *Dunn v. Dunn*, 802 P.2d 1314 (Utah Ct. App. 1990), in support of his argument that the May 2019 Stipulation should be set aside. In that case, the parties to a divorce stipulated to an expert's valuation of certain retirement accounts. *See id.* at 1320. But because "[t]he marital estate . . . should be valued as of the time of the divorce decree," and because the data the expert relied on in valuing the retirement accounts was fifteen months old at the time of trial, the *Dunn* court held that the valuation was "inadequate to support an equitable division of this sizable asset." *Id.* The court further stated that "[w]hile the parties stipulated to the values of the retirement accounts as of the date of valuation, *they also stipulated to the possibility that the values of the accounts may change between the date of the valuation and the date of the divorce*." *Id.* (emphasis added). As a result, the court was "not persuaded that the stipulation purported to fix the value of the retirement account as of the date of the divorce decree." *Id.*

¶49 The trial court in this case distinguished *Dunn* on the ground that, "unlike *Dunn*, where the Court of Appeals was not persuaded that the relevant stipulation in that case purported to fix the value of the asset as of the date of the divorce decree, this Court is persuaded that the [May 2019 Stipulation] to the value of Ascent Construction purported to fix the value of the asset for all purposes related to the equitable division of the parties' marital property." The court further noted that the May 2019 Stipulation was entered into at the beginning of trial after the specific question of whether Ascent Expert's valuation needed to be updated was raised.

¶50 Bradley argues that the holding in *Dunn* did not hinge on the parties' stipulation allowing for the possibility that the value of the retirement benefits could change.[11] Bradley further argues that under *Klein v. Klein*, 544 P.2d 472 (Utah 1975), "it would have been an abuse of discretion *not* to update the valuation in *Dunn*." In sum, Bradley argues "that stipulations can and should be set aside when they yield an inequitable result . . . or when the information becomes stale over time." Although we do not necessarily disagree with the general proposition Bradley sets

---

11. Bradley also asserts that the parties did stipulate to allow for a more current valuation at trial because the parties' original stipulation stated, with our emphasis, that the "valuation date will be as of the most current, complete financial information available for [Ascent]," which was expected to be "as of December 31, 2017, *or more current*." But this overlooks the context in which the May 2019 Stipulation was entered. Namely, it was after the parties had attempted to have Ascent Expert provide a more updated valuation of Ascent that they decided, in the interest of avoiding further litigation on the subject, that Ascent Expert's valuation that was current as of December 31, 2017, "will be the valuation we'll use on this asset for this trial." Accordingly, the May 2019 Stipulation expressly foreclosed further updates on the valuation of Ascent.

forth, we cannot say that the trial court abused its discretion when it decided against setting the May 2019 Stipulation aside.

¶51 As an initial matter, a plain reading of *Dunn* provides that the parties' stipulation did not override the general rule that "[t]he marital estate . . . should be valued as of the time of the divorce decree" because the stipulation did not purport "to fix the value of the retirement account as of the date of the divorce decree." 802 P.2d at 1320. And because the stipulation did not preclude an updated valuation of the asset at issue, the *Dunn* court did not need to address whether the stipulation should be set aside. Accordingly, contrary to Bradley's assertion, the *Dunn* case did hinge on the fact that the parties' stipulation allowed for an updated valuation of the retirement accounts.

¶52 We likewise disagree that *Klein* would have nonetheless mandated an updated valuation of the retirement benefits in *Dunn*. Bradley cites *Klein* for the proposition that "[i]f there is any justification in law or equity for avoiding or repudiating a stipulation, and [a party] timely does so, [the party] is entitled to be relieved from it."[12] 544 P.2d at 476. But the determination of whether a "justification in . . . equity" exists remains within the trial court's discretion. *Id.* The general standard under which a

---

12. Bradley also cites *Klein* for the proposition that a stipulation in a divorce proceeding "is only a recommendation to be adhered to if the court believes it to be fair and reasonable." *Klein v. Klein*, 544 P.2d 472, 476 (Utah 1975). But our Supreme Court has since stated that "the governing principle in our law is that contracts between spouses are enforceable and generally subject to ordinary contract principles so long as they are negotiated in good faith and do not unreasonably constrain the divorce court's equitable and statutory duties." *Ashby v. Ashby*, 2010 UT 7, ¶ 21, 227 P.3d 246 (quotation simplified). Accordingly, stipulations between spouses, at least on subjects other than child custody and child support (where best-interest-of-the-child principles must be taken into account), have since been elevated from mere recommendations to presumptively enforceable contracts.

stipulation may be set aside is "whether the contract was fairly negotiated and does not result in an outcome so severely one sided that it prevents the district court from fulfilling its equitable obligations." *Ashby v. Ashby*, 2010 UT 7, ¶ 21, 227 P.3d 246. Accordingly, a trial court's determination whether to set aside a stipulation falls within the "wide discretion" granted it "in the division of marital property," which is "a matter of equity." *Hartvigsen v. Hartvigsen*, 2018 UT App 238, ¶ 27, 437 P.3d 1257 (quotation simplified). And here, in light of several factors, we cannot say that the trial court abused its discretion in enforcing the May 2019 Stipulation and declining to update the valuation of Ascent.

¶53 First, as the trial court noted, the May 2019 Stipulation was entered during trial. Thus, although the parties were aware at the time that an updated valuation of Ascent could likely be obtained, they nonetheless agreed that the report regarding "the 2017 valuation will be the valuation we'll use on this asset for this trial." And unlike in *Dunn*, the May 2019 Stipulation did not allow for the possibility that the court could consider an updated valuation down the line. *See supra* note 11.

¶54 Second, the May 2019 Stipulation was entered after the parties had, with some difficulty, already attempted to update Ascent Expert's valuation. When the court initially ordered an updated valuation of Ascent, it directed, with our emphasis, that Ascent "produce the information and documents requested by [Ascent Expert], *including any partial or preliminary materials* that are responsive to [Ascent Expert's] request." But Bradley failed to provide most of the requested documents, stating that many of those documents were "[n]ot yet finalized." To avoid further litigation on the subject of updating the valuation of Ascent, the parties stipulated that they would proceed with the already existing valuation. This benefitted Bradley by avoiding further inquiry into his apparent failure to abide by the court's order to produce even partial or preliminary versions of the requested materials.

¶55 Third, by deciding to enforce the May 2019 Stipulation, the court necessarily determined that its terms were equitable and did not "result in an outcome so severely one sided that it prevent[ed] the district court from fulfilling its equitable obligations." *See Ashby*, 2010 UT 7, ¶ 21. *See also Robinson v. Robinson*, 2010 UT App 96, ¶ 13, 232 P.3d 1081 ("[F]rom the district court's decision to enforce the stipulation, we assume—and have no findings that would indicate otherwise—that the court determined that the property division was equitable."). Indeed, the court expressly stated that it had "considered the impact of [the] multi-million dollar collection efforts against the stipulated valuation of Ascent" when it declined to set aside the May 2019 Stipulation, thereby necessarily finding the stipulation to be equitable even in light of Ascent's legal troubles.

¶56 Fourth, when Shondell argued in closing that the stipulated valuation should be adjusted because evidence at trial suggested the 10% "lack of control discount" was not warranted, Bradley was quick to insist on the inviolability of the May 2019 Stipulation, arguing that the parties had conclusively "stipulated to both the value ($2,157,000) and distribution of Ascent." The court could reasonably consider this prior position taken by Bradley in evaluating his later position that the May 2019 Stipulation should be undone.

¶57 Finally, the May 2019 Stipulation was "fairly negotiated." *See Ashby*, 2010 UT 7, ¶ 21. Both parties were sophisticated and represented by counsel when they entered the stipulation. Although parties need not be represented by counsel to enter a stipulation, *see Cox v. Hefley*, 2019 UT App 60, ¶ 21, 441 P.3d 769, such representation certainly weighs in favor of concluding that a stipulation has been fairly negotiated, *see Robinson*, 2010 UT App 96, ¶ 13 (stating that the appellate court could not determine that the trial court had abused its discretion "based on the facts of this case, in particular the sophistication of the parties and the fact that they each had the opportunity to consult with counsel and other advisors before entering the stipulation").

¶58   Thus, in the context in which the May 2019 Stipulation was entered, we cannot say that "no reasonable person would take the view adopted by the trial court." *See Gardner v. Gardner*, 2019 UT 61, ¶ 18, 452 P.3d 1134 (quotation simplified). The court therefore did not abuse its discretion when it enforced the May 2019 Stipulation and declined Bradley's request to update Ascent Expert's valuation of Ascent.

B.    TIF Funds

¶59   Bradley argues that the trial court abused its discretion when it adopted the valuation of the TIF Funds provided by Shondell's Expert over the one provided by Bradley's Expert. First, he asserts that Shondell's Expert provided the inferior opinion because he "provided a calculation engagement, rather than an opinion of value,"[13] whereas Bradley's Expert provided an opinion of value.[14] Second, Bradley argues that the valuation

---

13. Bradley also assails the qualifications of Shondell's Expert to opine as to the value of the TIF Funds. Specifically, Bradley asserts that, although a certified public accountant, Shondell's Expert "was not licensed to provide an attestation of value." But Bradley stipulated at trial that Shondell's Expert was qualified to testify as an expert. Additionally, as Bradley acknowledges, Shondell's Expert "offered a calculation [engagement] instead" of an opinion of value, and therefore the qualification of Shondell's Expert to provide the latter is irrelevant. Finally, the trial court—which is in the superior position to assess the weight of evidence, *see Morgan v. Morgan*, 854 P.2d 559, 563 (Utah Ct. App. 1993)—found these arguments to be unpersuasive, stating that Bradley's Expert "does not appear to have any greater expertise in doing a discounted analysis of a future payment stream than does Shondell's Expert."

14. Shondell's Expert explained that an opinion of value involves "opining as to the value of the underlying asset," whereas a calculation engagement involves putting the underlying assets "into a format that would . . . lead the user to put the information

(continued…)

provided by Shondell's Expert failed to account for the 7% interest that was accruing on the first portion of the TIF Funds. And third, Bradley argues that Shondell's Expert incorrectly applied a 7% discount—3% for inflation and 4% for risk—to the second portion of the TIF Funds. He contends that the 4% discount for risk, which was partly based on the possibility that the tax increment period would expire in 2033 before the TIF Funds were paid in full, was inappropriate because the tax increment period had actually been extended, thereby diminishing the risk.[15]

¶60   "When considering testimony regarding valuation of property, the trial court is entitled to give conflicting opinions whatever weight it deems appropriate, and a trial court's valuation will be upheld if it is within the range of values established by all the evidence." *DeAvila v. DeAvila*, 2017 UT App 146, ¶ 22, 402 P.3d 184 (quotation simplified). *See Morgan v. Morgan*, 854 P.2d 559, 563 (Utah Ct. App. 1993) ("[E]valuation of the weight and credibility of testimony and evidence is a matter for the trier of fact."). Accordingly, merely "failing to accept one party's proposed valuations does not constitute an abuse of discretion." *Taft v. Taft*, 2016 UT App 135, ¶ 33, 379 P.3d 890 (quotation simplified).

¶61   Here, before determining a specific value for the second portion of the TIF Funds, the trial court had to first determine whether a discount needed to be applied to its $1.1 million face value. Bradley's Expert testified that no discount was warranted due to the 7% interest accruing on the first portion of the TIF Funds and based on Ogden City's "AAA" bond rating. Shondell's

_____

to a statement of value." Bradley's Expert explained that a calculation engagement involves accepting the figures provided by the client without scrutiny and putting them "into a form of valuation," without providing an "opinion of value."

15. Bradley asserts that the tax increment period had been extended from 2033 to 2045, but the record is unclear whether it was extended until 2038 or 2045.

Expert, on the other hand, testified that the $1.1 million value should be discounted due to several factors, including inflation, his estimation that payment on the second portion would not begin for another ten years and would take approximately four years to be paid off, the risk of non-payment based on "substantial uncertainties that remain with the project," and the lack of interest accruing on the second portion. Having heard testimony from both experts on this issue, the trial court adopted the opinion of Shondell's Expert, holding that "a discount must be applied in arriving at a proper valuation of that income stream."

¶62    Bradley does not argue that the court abused its discretion in concluding that a discount was necessary. Instead, he challenges specific aspects of the valuation provided by Shondell's Expert. But because Bradley's Expert provided no "competing discounted analysis," the discounted valuation provided by Shondell's Expert was the only valuation before the court that discounted the face value of the second portion of the TIF Funds.[16]

---

16. Bradley argues that Bradley's Expert did, in fact, discount the second portion of the TIF Funds because he testified the 7% interest accruing on the first portion of the TIF Funds balanced out any risk associated with the second portion of the TIF Funds. Specifically, Bradley's Expert stated that "[t]he risk of non-payment is nominal because [Ogden is] a AAA bond-rated city." He reached this conclusion by "compar[ing] the increase from the 600,000 with . . . a discounted interest rate on the 1.7 [million] total at the rate of the Ogden TIF, or Ogden AAA bond rating rates," which he assumed to be "2 percent to be conservative." And if "[y]ou run interest at 2 percent on the entire 1.7 million, compared to the interest you would get . . . on the 600,000, the interest on the entire amount, 1.7 with 2 percent doesn't equal the 7 percent you would get on the 600,000 upfront."

But the trial court held that Ogden City's "AAA" bond rating and "[ability] to borrow funds at a very low interest rate are not

(continued…)

¶63 Viewed through that lens, it was not a clear abuse of discretion for the trial court to adopt the sole expert valuation that satisfied the court's threshold requirement of applying a discount to the second portion of the TIF Funds. Even assuming that Bradley's Expert applied a superior method of valuing the asset, and although he disagreed with certain aspects of the methodology Shondell's Expert applied, the valuation provided by Shondell's Expert was "within the range of values established by all the evidence." *See DeAvila*, 2017 UT App 146, ¶ 22 (quotation simplified). Shondell's Expert based his 3% discount for inflation on "the inflation rate over the past several years as promulgated by the IRS." He also reached the 4% figure by

---

directly material to the valuation of" the TIF Funds because "Ogden City is not a guarantor of that payment stream," but, rather, its "obligation is simply to be sure the payments, if received, are disbursed in accordance with the governing disbursement agreement." By so holding, the court rejected the entire basis for Bradley's Expert's conclusion that the second portion of the TIF Funds carried only a nominal risk. Bradley does not challenge this determination other than by asserting that Ogden City's bond rating "*is* material [because] it affects risk," and he has therefore not met his burden of persuasion in challenging the court's determination. *See* Utah R. App. P. 24(a)(8).

In sum, Bradley's Expert did not provide an analysis as to how the second portion of the TIF Funds should be discounted based on risk, inflation, or any other relevant factor. Although Bradley's Expert testified that the first portion of the TIF Funds should be viewed at a premium based on its 7% interest rate, the court stated that "he did not offer a specific valuation of the initial $600,000 payment stream" and that he declined to discount the second portion of the TIF Funds despite acknowledging that it "would ordinarily be discounted."

analyzing the information he obtained directly from Ogden City to assess the risk of nonpayment.[17]

¶64    For these reasons, the trial court did not abuse its discretion when it adopted Shondell's Expert's valuation of the TIF Funds.

C.    JRM

¶65    "The overarching aim of a property division . . . is to achieve a fair, just and equitable result between the parties." *Dahl v. Dahl*, 2015 UT 79, ¶ 25, 459 P.3d 276 (quotation simplified). Although "there is no fixed formula for determining the division of debts in a divorce action," a district court must base its allocation of debt "on adequate factual findings." *Id.* ¶ 139. "And we will not disturb those findings absent an abuse of discretion." *Id.*

¶66    Bradley asserts that the trial court abused its discretion when it did not assign a negative value to JRM based on the $88,403 debt it owed Ascent at the time of trial. Specifically, he contends that (1) the court's $100 valuation was unsupported by the evidence; (2) the court's focus on avoiding future entanglements could have been achieved in a more equitable manner by "allotting half [of JRM's debt] to Shondell's column, and then awarding the entity, its future debt, and its future payout to Brad"; and (3) the court erred in determining "that the debt was

---

17. Bradley argues that the valuation is flawed because it did not account for the 7% interest accruing on the first portion of the TIF Funds. But the trial court did not hear an alternative valuation for the first portion of the TIF Funds. The court specifically stated that although Bradley's Expert testified that the first portion of the TIF Funds should be viewed at a premium based on its 7% interest rate, "he did not offer a specific valuation of the initial $600,000 payment stream." The court therefore did not abuse its discretion by not assigning a higher value to the first portion of the TIF Funds.

irrelevant because it was owed to Ascent, not to an outside party, and because Brad was being awarded JRM and Ascent."[18] We disagree.

¶67 First, the court's valuation of JRM was supported by the evidence presented at trial, limited though it was. The court heard testimony that JRM owed Ascent $88,403 and that JRM's sole asset at the time of trial was an ongoing lawsuit against West Valley City. Concerning the lawsuit, neither party's expert provided a valuation, and each instead recommended that the parties wait until the litigation is resolved and then equally split the recovery, if any. Bradley was confident that the lawsuit would ultimately prove successful and testified that it "still has value" and "still has merit." Bradley also insisted that the merits of the lawsuit "justif[ied] continued payment of attorney fees and other costs associated with that litigation" even though he had already spent in excess of $400,000 in legal fees. Shondell, on the other hand, was less optimistic about their chances of recovery and "seem[ed] unwilling to fund the costs of future litigation."

¶68 In light of these facts, even without an expert valuation of the lawsuit, it was not unreasonable for the court to decline to follow the experts' recommendations of waiting until the lawsuit had resolved itself. The court was faced with a situation in which one party wished to continue to pursue the lawsuit, while the other wished to cut her losses and not incur additional debt. Thus, by not waiting, the court resolved this point of contention and avoided forcing either Shondell to incur what she believed to be unnecessary additional losses for the marital estate or Bradley to abandon what he believed to be a meritorious lawsuit. This decision also avoided "future entanglement between the two parties," who were unlikely to agree on how best to proceed with the lawsuit, and instead allowed Bradley "to make decisions

---

18. Bradley also asserts that the court erred in stating "that the debt was JRM's debt, not a marital debt." But we need not address this argument because the court stated that it "took the payable into account when determining what value to assign JRM."

about whether and to what extent to invest his own funds into covering future litigation costs."

¶69 Thus, while faced with "the significantly speculative nature of any future recovery" from the lawsuit, the court stated that the $100 valuation represented the "balancing of the $88,403 liability of JRM against Brad's view that JRM's claims had significant future value." *Cf. DeAvila v. DeAvila*, 2017 UT App 146, ¶ 25, 402 P.3d 184 ("Under Utah law, a knowledgeable owner generally may testify as to the market value of property, including in divorce cases[.]") (quotation simplified). In doing so, the court acknowledged that "if the claims really do have significant value"—as Bradley insisted—"Brad may receive a windfall" as a result of this low valuation. Although the evidence was limited, the court's valuation was supported by the evidence presented at trial: evidence of the debt and Bradley's testimony that the lawsuit had merit and warranted the investment of additional funds. And in light of this evidence, it was not unreasonable for the trial court to assign JRM a nominal value of $100, while giving Bradley the chance to see if his gamble might pay off, without further imposition on Shondell. *See Gardner v. Gardner*, 2019 UT 61, ¶ 18, 452 P.3d 1134 (stating that a trial court abuses its discretion "only if no reasonable person would take the view adopted by the trial court") (quotation simplified).

¶70 The court also did not abuse its discretion when it did not assign half of JRM's $88,403 debt to Shondell. Bradley contends that by assigning the whole debt to him, "the court lowered [his] share by $44,201.50 and augmented Shondell's share by the same amount." But although this debt was a liability of JRM, it was also an asset of Ascent, which was also awarded in its entirety to Bradley. Thus, although Bradley was made responsible for the entirety of the marital debt attributable to JRM, he was also, in essence, awarded the entirety of that sum as one of the marital assets allocated to him. And as discussed above, the court accounted for the debt in its $100 valuation of JRM. The debt thus reduced the value of JRM as an asset, which the court took into

account when it divided the other marital assets between the parties in an equitable manner.

## II. Division and Reconciliation of the Marital Estate

¶71 Bradley argues that "[t]he trial court abused its discretion when it did not reconcile, at trial, the parties' respective obligations under the Temporary Order." We address each of his arguments in turn.

### A. Idaho Cabin Expenses

¶72 The Temporary Order directed Bradley to "advance the ongoing expenses associated with the [Idaho] cabin subject to equalization and upon final distribution of the parties' property." Bradley contends that the trial court "abused its discretion when it failed to reconcile the amount that [he] had spent to service the cabin with 'his' money as required by the" Temporary Order. He asserts that "[t]he parties stipulated that [he] would service the cabin, he provided evidence that he did so, the parties stipulated that the amounts he spent would be reconciled, but they were not," which "deprives [him] of the ability to enjoy the marital estate in the same way as Shondell."

¶73 Bradley's argument hinges on his contention that he maintained the cabin using his separate funds, rather than marital property.[19] Although Bradley did offer evidence that he provided funds for the maintenance of the cabin, there is no evidence in the record that Bradley used his separate funds—as opposed to marital funds—for that purpose. Indeed, the trial court found that

---

19. In his reply brief, Bradley asserts that under the Temporary Order, Bradley was to use his $15,000 monthly allowance to pay for the cabin's maintenance. But the Temporary Order "awarded" $15,000 to Bradley on a monthly basis as "income," and the Temporary Order is otherwise silent as to how the funds are to be used.

Bradley had used marital funds to maintain the marital estate, which finding Bradley has not challenged on appeal.

¶74 When a party to a divorce proceeding uses marital funds to pay a marital expense, "the value of the marital estate [is] reduced by the amount of those costs." *Dahl v. Dahl*, 2015 UT 79, ¶ 133, 459 P.3d 276. Because marital property is "owned equally by each party," *id.* ¶ 126, "when the district court divide[s] the marital estate, both parties [have] effectively paid one-half" of the payments, *id.* ¶ 133. Thus, requiring one party to reimburse the other for expenses paid with marital funds effectively results in a double payment. *Id.*

¶75 For this reason, it would have been inequitable for the trial court to credit Bradley for maintaining the marital property with marital funds, and the court therefore did not abuse its discretion by not requiring Shondell to compensate Bradley for half of the funds he disbursed for the maintenance of the cabin.[20]

---

20. Bradley also argues that the trial court abused its discretion when it failed to credit him for making the $15,000 monthly payments to Shondell under the Temporary Order, which he asserts constituted "more than all the non-wage driven income from [the] marital entities." But Bradley does not directly address the court's reasoning in not crediting the sum.

Because Bradley had "virtually unfettered access to the marital funds during the pendency of the divorce proceedings," while Shondell did not, Shondell requested that the court conduct "an equalization of income received by Brad during the pendency of the divorce case." Specifically, Shondell asserted that between June 2017 and December 2019, Bradley received approximately $102,000 per month from the marital estate. The court declined Shondell's request in part because, with a few exceptions, "the amounts [Bradley] received in excess of the funds he used to pay his own expenses and to make required payments to Shondell were generally used to support the marital assets." Due to the

(continued…)

## B. Premature Partial Distributions

¶76 Shondell and Bradley each received $840,000 under the Temporary Order, which stated that the sum represented "an equal premature partial distribution to each party from the marital estate." The Temporary Order further provided "that funds held in other bank accounts will be subject to review, reconciliation and equalization during the disclosure and discovery process." Each party also received an additional $39,417 in premature partial distributions, which represented half of a $78,834 distribution Bradley received from a marital property. Bradley's former counsel emailed Shondell's counsel in October 2017, stating that Shondell would receive her half "as a distribution in part of [her] portion of the marital estate." This resulted in each party receiving, by stipulation, a total of $879,417 in premature partial distributions.

¶77 Shondell used her premature partial distributions to purchase homes that had appreciated in value by the time of trial. Bradley, on the other hand, deposited much of his premature partial distributions into a bank account of one of the businesses he managed to ensure Shondell did not have access to them and used the funds to—among other things—purchase two vehicles and an engagement ring for his soon-to-be new wife, and to pay for their wedding reception and honeymoon.

---

court's denial of Shondell's motion to conduct an equalization of income, it is unclear how closely the funds Bradley used to cover his living expenses matched the $15,000 monthly income to which he was entitled under the Temporary Order. Nevertheless, it is uncontested that Bradley likewise used marital funds to cover his own living expenses during the pendency of the divorce proceedings. And because neither party has challenged the court's denial of Shondell's motion, for the same reason articulated above the trial court did not abuse its discretion when it did not credit Bradley for the $15,000 monthly payments he made to Shondell from the marital estate.

¶78    At trial, Bradley argued that the appreciation of the assets acquired by Shondell using her premature partial distributions belonged to the marital estate and should be divided between the parties. The court rejected this argument, stating that "the language of the [Temporary Order] and the [October 2017] email between counsel is clear that the proceeds of these premature partial distributions are the parties' separate property, and that assets purchased by the parties with the proceeds of these premature partial distributions are their separate property."

¶79    Bradley argues that "the trial court erred as a matter of law when it awarded to Shondell, rather than divided, the appreciation on properties Shondell purchased" using her premature partial distribution. Specifically, he contends that the court erred in determining that the premature partial distributions constituted Shondell's separate property—and not marital property—because the parties were not yet divorced at the time the distributions were made. *See generally Dahl v. Dahl*, 2015 UT 79, ¶ 126, 459 P.3d 276 ("Prior to the entry of a divorce decree, all property acquired by parties to a marriage is marital property, owned equally by each party."); *Berger v. Berger*, 713 P.2d 695, 697 (Utah 1985) ("The marital estate should be valued as of the time of the divorce decree.").

¶80    But as discussed in greater detail in Part I.A. above, "a stipulation will ordinarily be enforced unless the court finds it to be unfair or unreasonable." *Robinson v. Robinson*, 2010 UT App 96, ¶ 13, 232 P.3d 1081 (quotation simplified). *See Thayer v. Thayer*, 2016 UT App 146, ¶ 17, 378 P.3d 1232 ("[E]ven in the context of a divorce, parties are generally bound by their stipulations."). Thus, the issue presented here is whether the parties stipulated in the Temporary Order and in the October 2017 email that the premature partial distributions constituted separate property. If they did, then any appreciation that accrued until entry of the divorce decree was likewise separate property. *See Lindsey v. Lindsey*, 2017 UT App 38, ¶ 31, 392 P.3d 968 (stating that "any appreciation that may accrue [on separate property] during the marriage" is separate property). We hold that the trial court

correctly determined that under the terms of the Temporary Order and the October 2017 email, the parties agreed that the premature partial distributions were separate property.[21]

¶81    As an initial matter, both the Temporary Order and the October 2017 email referred to the funds each party received as "distributions" from the marital estate. In the context of divorce, the term "distribution" is used to describe "[t]he division of marital property," *see Equitable Distribution*, Black's Law Dictionary (11th ed. 2019), the end result of which is separate property to each party. This definition is in line with the October 2017 email, which provided that the $39,417 represented, with our emphasis, "a distribution in part of [Shondell's] *portion of the marital estate*."

¶82    The Temporary Order's description of the $840,000 to each party as a "premature partial distribution . . . from the marital estate" likewise communicates that the funds were intended to be separate property. The use of the term "premature" acknowledged that such a distribution is normally made at a later time. Other than by way of contrast to the more typical division of the marital estate upon entry of a divorce decree, it is unclear to what other future event the term "premature" could refer, especially when combined with the term "distribution." Similarly, the use of the term "partial" recognized that the distributed sums did not represent the entirety of the marital estate. Finally, by stating that funds other than the premature partial distributions "will be subject to review, reconciliation and equalization during the disclosure and discovery process"—which represents the normal procedure in which the marital estate is identified and distributed—the Temporary Order suggested that the premature

---

21. Indeed, Bradley does not offer an alternative interpretation of the terms of the Temporary Order or of the October 2017 email. He also has not argued that the trial court abused its discretion in holding the parties to their agreement.

partial distributions were to be treated, following distribution, as separate property rather than marital property.

¶83 In conclusion, because the parties agreed that the premature partial distributions represented an early division of a portion of the marital estate, the funds became separate property and Bradley was not entitled to any of the appreciation on the properties Shondell purchased with her premature marital distributions.

C.      Dissipation of the Marital Estate

¶84 Bradley challenges the trial court's determination that he dissipated the marital estate by using $564,100 of marital funds to pay his legal expenses in the divorce proceeding and by treating that sum "as marital assets already received by" him. His argument boils down to the assertion that because it was unclear how much in marital funds Shondell had also spent on her legal expenses, "it was inequitable to assume that only [he] had used marital funds."

¶85 In support of this argument, Bradley asserts that it is unknown what portion of the "significant marital funds" to which Shondell had access—namely, the $15,000 monthly allowance and "various other payments" she received totaling $448,744.19 between June 2017 and March 2019—she spent on legal expenses.[22] He also asserts that because Shondell failed to make certain disclosures of her income, expenses, and assets under rule 26.1(c) of the Utah Rules of Civil Procedure and to provide bank statements of two of her business entities, it was possible she had access to additional undisclosed marital funds that she could have

---

22. Bradley also includes Shondell's premature partial distributions when discussing marital funds to which Shondell had access. But, as discussed in Part II.B. above, the premature partial distributions were Shondell's separate property, and not marital funds.

used to pay her legal expenses. We disagree with Bradley that the court's dissipation ruling constituted a clear abuse of discretion.

¶86 As an initial matter, whether Shondell used part of her $15,000 monthly allowance to pay legal expenses is immaterial in this context. Both parties were entitled to an equal monthly allowance under the Temporary Order.[23] Thus, even if Shondell did use a portion of her allowance on legal expenses, such an expenditure did not constitute an *additional* withdrawal of funds from the marital estate that had not already been accounted for. Conversely, the trial court specifically found that Bradley's payment of legal expenses "were payments in addition to, and in excess of, the funds Brad was using to cover his own personal living expenses" and that he made no similar provision in addition to the monthly allowance to Shondell to cover her own legal expenses. Accordingly, how Shondell spent her monthly allocation is ultimately immaterial to the determination of whether Bradley dissipated the marital estate when he used marital funds far in excess of the $15,000 allotted to him by the Temporary Order to pay legal expenses.

¶87 And in any event, the trial court, quoting *Boyer v. Boyer*, 2011 UT App 141, 259 P.3d 1063, stated in response to Bradley's post-trial motion that the court "should also consider whether there are exceptional circumstances that overcome the general presumption that marital property [should] be divided equally

---

23. Bradley also asserts that because he testified at trial that his personal expenses during the pendency of the divorce totaled $221,850.26—which was significantly lower than what Shondell had received during that same period—the court should have considered this discrepancy "when balancing each party's spending." But as discussed in footnote 20, the trial court declined Shondell's request to conduct "an equalization of income received by Brad during the pendency of the divorce case," which decision neither party has challenged on appeal. Accordingly, it is unclear how Bradley's personal expenses actually compared to those of Shondell.

between the parties." *See id.* ¶ 10. In this context, it stated that in making its ruling, it "took into account the very different financial positions of Brad and Shondell in attempting to fairly and equitably address the obvious imbalance" that resulted from Bradley's "virtually unfettered access to the marital funds during the pendency of the divorce proceedings" and his use of those funds to pay his legal expenses without providing Shondell with a similar benefit. *See generally Dahl v. Dahl*, 2015 UT 79, ¶ 126, 459 P.3d 276 ("[I]t is improper to allow one spouse access to marital funds to pay for reasonable and ordinary living expenses while the divorce is pending, while denying the other spouse the same access."). And Bradley has not challenged on appeal the court's determination that this represented such an exceptional circumstance.[24] Thus, to the extent that the court failed to consider additional sources of marital income that were possibly available to Shondell when it treated the $564,100 Bradley had spent on legal expenses "as marital assets already received by Brad," such an omission did not constitute a clear abuse of discretion.

¶88 For the reasons articulated above, the trial court did not commit a clear abuse of discretion when it found that Bradley had dissipated the marital estate by using marital funds to pay his legal expenses and that that amount should be regarded as a distribution of marital assets already made to him.

---

24. Bradley's challenge to the court's finding that he, unlike Shondell, had "virtually unfettered access to the marital funds during the pendency of the divorce proceedings," is limited to the assertion that it "was not true and not supported by the evidence." But because Bradley has not marshaled the evidence in support of the court's finding, he has not carried his burden of persuasion on this issue. *See Pankhurst v. Pankhurst*, 2022 UT App 36, ¶ 15, 508 P.3d 612 ("A party will almost certainly fail to carry its burden of persuasion on appeal if it fails to marshal the evidence sufficient to overcome the healthy dose of deference owed to factual findings.") (quotation simplified).

## III. Contempt of Court

¶89 Contempt of court is, among other things, the "disobedience of any lawful judgment, order, or process of the court." Utah Code Ann. § 78B-6-301(5) (LexisNexis 2018). "As a general rule, in order to prove contempt for failure to comply with a court order it must be shown"—by clear and convincing evidence—"that the person cited for contempt knew what was required, had the ability to comply, and intentionally failed or refused to do so." *Wadsworth v. Wadsworth*, 2022 UT App 28, ¶ 108, 507 P.3d 385 (quotation simplified).

¶90 Bradley argues that the trial court abused its discretion when it did not hold Shondell in contempt because he had proven all the elements of contempt. He asserts that "Shondell 'knew what was required' because the Temporary Order prohibited her unilateral withdrawal of funds from marital accounts."[25] Bradley also contends that "Shondell 'had the ability to comply' because she could have not withdrawn the funds" and, instead, could have waited for Bradley to pay the tax obligation, could have used unnamed "other sources" to pay it, or could have first sought permission from Bradley or the court to withdraw the funds from ShoniK. Finally, he contends that "she intentionally failed or refused to [comply with the Temporary Order] because she never pursued her other options or requested permission to withdraw funds."

---

25. Specifically, the Temporary Order provided:
> The parties are enjoined and restrained from charging or incurring any debts or obligations against each other and [Shondell] shall not make any withdrawals or transactions from the parties' line of credit . . . and from selling, encumbering, secreting, or disposing of the assets of the parties without written approval of the other party or order of the court.

¶91 Bradley's argument overlooks the trial court's specific determination that, when "[v]iewing the totality of circumstances," Bradley had not proven "by clear and convincing evidence, that Shondell knowingly and intentionally violated the provisions" of the Temporary Order. In support of its conclusion that, in light of the totality of the circumstances, Shondell lacked the necessary intent to be in contempt of court, the court cited several factors, including that the funds were used to pay a marital tax obligation; that a few years earlier, albeit before the Temporary Order was put into place, Bradley had made a similar withdrawal from ShoniK to pay off the Idaho cabin; that Shondell did not hide the withdrawal from Bradley; that provision had already been made for the return of the funds from an expected tax refund; and that Shondell acted on the advice of accountants.

¶92 Bradley does not address the court's specific reasoning. Instead, he asserts that "[n]either Shondell nor the trial court contended that the elements of contempt were *not* met," but that the court instead held that Shondell should not be held in contempt "because (1) the tax debt was marital and (2) Brad had also once, years before the parties separated, withdrawn funds from [ShoniK] to pay off the marital cabin." In essence, Bradley argues that for the aforementioned reasons, the court excused Shondell from the contempt she demonstrably committed. But this mischaracterizes the court's conclusion.

¶93 Despite Bradley's assertions otherwise, the court specifically stated that Bradley had failed to prove, by clear and convincing evidence, the third element of contempt: "that Shondell knowingly and intentionally violated the provisions" of the Temporary Order. It therefore did not, as Bradley argues, excuse Shondell despite finding that all elements of contempt were met. The purpose of the court's discussion of the totality of the circumstances surrounding Shondell's withdrawal of ShoniK funds was not to excuse Shondell's actions but to explain why it could not find, by clear and convincing evidence, that Shondell intentionally violated the Temporary Order.

¶94    Thus, because Bradley does not address the court's specific reasoning, he has not carried his burden of persuasion on this issue, and we do not address it further. *See* Utah R. App. P. 24(a)(8).

## CONCLUSION

¶95    The trial court did not abuse its discretion in its valuation of certain assets or in its reconciliation and ultimate equitable distribution of the marital estate. It likewise did not abuse its discretion when it declined to hold Shondell in contempt of court.

¶96    Affirmed.

———————